**Juan RODRIGUEZ, Plaintiff,**

v.

**The CITY OF PASSAIC, The City of Passaic Police Department, Police Officer Detective Judith Kicha, and Police Officers "John Does" Whose Names are Unknown to Plaintiff, Defendants.**

**Civ. A. No. 85–1911 (MTB).**

United States District Court,
D. New Jersey.

Feb. 21, 1990.

Kliegerman & Friess, New York City by Rosemary Carroll, for plaintiff.

Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, Livingston, N.J. by

Robert John Aste, for defendants City of Passaic and City of Passaic Police Dept.

John A. Gurdak, Clifton, N.J., for defendant Judith Kicha.

## OPINION

BARRY, District Judge.

### INTRODUCTION

No doubt motivated at least in part by the serious nature of plaintiff's injuries, this court has accorded him the benefit of every call along the way, most particularly with reference to a serious statute of limitations problem. The problem is this: although plaintiff was shot on January 8, 1978, he did not file this civil rights action until December 21, 1984, almost seven years later and, absent tolling of the statute of limitations for almost five years, well out of time.[1]

First, this court determined that the judge to whom this case was formerly assigned had erred in concluding that, in the federal courts, a hearing as to whether plaintiff was "insane" within the meaning of N.J.S.A. 2A:14–21 and, if so, whether the statute of limitations should be tolled was for the court and not for the jury. (Letter Opinion and Order, May 1, 1986). Certainly, had this court not effectively reversed its brother judge but, rather, tried the statute of limitations issue to the bench, the evidence at that time would most likely have led this court to find that plaintiff was not "insane," and certainly not insane for the requisite five years.

Second, defendants subsequently moved for summary judgment on the statute of limitations issue, a motion which was denied. Again, had this court been trying that issue rather than determining whether defendants' motion for summary judgment should be granted, the evidence submitted by defendants at that time would have

produced a very different result. The court stated:

> I am unable to conclude on the basis of the record before me that no reasonable person could find under the *Kyle* standard [*Kyle v. Green Acres at Verona, Inc.*, 44 N.J. 100, 207 A.2d 513 (1965)] as interpreted and extended in *Sobin* [*v. M. Frisch and Sons*, 108 N.J.Super. 99, 260 A.2d 228 (App.Div.1969), *certif. denied*, 55 N.J. 448, 262 A.2d 702 (1970)], that plaintiff was insane under N.J.S.A. 2A:14–21 or that he was [ ] insane for the lengthy period of time during which the statute must be tolled. The affidavits and medical evidence are conflicting and the issues of whether and for how long plaintiff was insane must go to the jury. *While this result is compelled under the rigorous summary judgment standard, plaintiff should be aware that, at least in this court's view, a most difficult task awaits him at trial.* (Opinion, Feb. 27, 1987 at 13), (emphasis added).

Subsequent discovery has made defendants' position even stronger. Without pausing to set forth the additional evidence that has been submitted, suffice it to say that there is now medical evidence that within days after the shooting, plaintiff was alert and responsive without any indication of confusion and evidence that the investigating detectives elicited clear verbal and non-verbal responses from him. Another witness, who found plaintiff during the month after the shooting to be alert, focused, and coherent, observed that plaintiff achieved some notoriety among his attending nurses for what was described as foul language, the fact that he was getting "kind of fresh", and his continual demands of his nurses that his body be rubbed with alcohol. (Mejia Dep. at 112–15, 149–50). That same witness, a Spanish-speaking social worker, recalled that in early 1978 she urged plaintiff's mother, who spent much time with her son then and thereafter and

---

1. This case has proceeded from day one on the agreement of the parties that a two year statute of limitations applies. *See* N.J.S.A. 2A:14–2. The Supreme Court's recent decision in *Owens v. Okure*, 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) prompts plaintiff to now press for a six year statute of limitations. Absent tolling, of course, this action even under a six year statute is out of time. That aside, *Cito v. Bridgewater Township Police Dep't*, 892 F.2d 23 (3d Cir.1989), leaves no doubt that it is the two year statute which is applicable.

may well have communicated what she was told to him, to seek legal advice regarding the shooting and provided the names of Spanish-speaking attorneys in the area. However, because there is still some minimal basis for plaintiff's claim that this action is not time-barred, this court will again deny defendants' motion for summary judgment on this ground, although it has even less confidence than before that plaintiff would ultimately prevail were the issue to go to the jury.

Because the complaint was filed years after the shooting and because this court has permitted the case to continue nonetheless, the case has become complicated, not as a factual matter but as a legal matter. Thus, currently before the court are defendants' motions for summary judgment raising a host of the usual grounds. Virtually every Supreme Court case on which defendants base a particular defense or on which plaintiff bases a particular claim was decided well after the shooting at issue here,[2] arguably requiring a determination as to whether at least some of those cases should or should not be applied retroactively and whether the applicable law was "clearly established" at the time of the shooting for the purpose of determining whether the individual defendant's motion for summary judgment based on qualified immunity should be granted—assuming, of course, that *Harlow v. Fitzgerald* is applied retroactively.

It is to the morass which plaintiff and the court have created that I now turn.

## I.

On October 14, 1977, the Villa Nova Tavern in Passaic was robbed by three or four Puerto Rican males. (Pardo Dep. at 8, 9, 22). The owner of the bar, Juan Pardo, had returned from the bank that morning with approximately $1000 in cash and was alone in the bar when the men entered. *Id.* at 8–9. As Pardo was serving drinks to two of the men, plaintiff pulled a revolver on Pardo and held it to his head, forcing him into a small office in the rear of the bar. *Id.* at 9–10, 23. Plaintiff and one of his accomplices then proceeded to take the cash from a security box, place it in a bag, and handcuff Pardo to a stationary steam pipe. *Id.* at 10–11, 24. One of the men also assaulted a patron, striking him on the back of the head with such force that he fell to the floor and bled profusely. *Id.* at 11. The men escaped with the money.

Detective Judith Kicha of the Passaic Police Department investigated the robbery. On January 8, 1978 she received a phone call from Pardo advising her that one of the individuals who had been involved was upstairs at 7–9 Third Street. (Final Pretrial Order, Stipulation of Facts at 10; Pardo Dep. at 15, 42). Kicha, together with her partner, Detective Martin Kemp, drove to the Tavern and picked up Pardo. (Final Pretrial Order, Stipulation of Facts at 10; Kemp Dep. at 81, 83). Kemp radioed for Detective Andrew Risko to meet them at an intersection near the building. (Final Pretrial Order, Stipulation of Facts at 10–11; Kemp Dep. at 81). Upon arriving at the intersection, Kicha, Kemp and Pardo were met by Risko and Officers Ronald Martinelli and Richard Williams. (Final Pretrial Order, Stipulation of Facts at 11; Kemp Report at 1).

Martinelli and Williams positioned themselves in the front and rear of 7–9 Third Street while Kicha, Kemp, Pardo and Risko

---

2. *See, e.g., Graham v. Conner,* —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Owens v. Okure, supra; City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), *cert. denied,* 476 U.S. 1154, 106 S.Ct. 2268, 90 L.Ed.2d 712 (1986); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

proceeded inside the building and up the stairs to the right front apartment on the second floor. (Final Pretrial Order, Stipulation of Facts at 11; Kemp Dep. at 81–82, 84; Williams Dep. at 32). In response to their knock, a child opened the door and the detectives and Pardo were permitted to enter the kitchen of the apartment. (Rodriguez Dep. at 9; Pardo Dep. at 17; Kemp Dep. at 84–86). The door of an adjacent bedroom was open and plaintiff, clad only in his underwear, was in bed with a woman. (Rodriguez Dep. at 9–10, 17; Pardo Dep. at 17–18; Kemp Dep. at 86–87).

The detectives entered the bedroom, identified themselves as police officers, and directed plaintiff to sit up. (Rodriguez Dep. at 11–14). Pardo also entered the bedroom and was asked if plaintiff was the one who "did the holdup." (Rodriguez Dep. at 13; Pardo Dep. at 18–19). He responded, "Yes, it was." (Pardo Dep. at 18). The detectives then instructed plaintiff to get dressed. (Rodriguez Dep. at 13). As plaintiff was in the process of dressing, a struggle ensued between the detectives, plaintiff, and the women occupants of the apartment. (Rodriguez Dep. at 13; Kicha Dep. at 136). Plaintiff broke free and ran out of the apartment. (Rodriguez Dep. at 27; Kicha Dep. at 136). Kicha gave chase. (Kicha Dep. at 136).

Plaintiff ran down the stairs, exited the building through the side door into an alleyway, and followed the alleyway to the enclosed yard behind 7–9 Third Street, with Kicha in pursuit.[3] (Rodriguez Dep. at 28–29; Kicha Dep. at 136–138, 140). He then ran across the yard and vaulted a six-foot chain-link fence into the enclosed backyard of 3–5 Third Street. (Bethea Dep. at 3–4; Kicha Dep. at 138; Kutchmanich Dep. at 113). He climbed onto a doghouse adjacent to a section of chain-link fence which separated the yard from a garage and prepared to scale that fence. (Rodriguez Dep. at 30, 34; Bethea Dep. at 4, 7).[4] It was then, plaintiff alleges, when he heard Kicha yell "Stop, police!" that he realized for the first time that he was being followed. (Rodriguez Dep. at 30–32). Having ordered plaintiff to halt, Kicha, who was still in the alleyway, fired a warning shot into the air. (Bethea Dep. at 8; Kicha Dep. at 138, 140). Plaintiff did not turn around but "jumped on up ... fixing to go over the top...." (Bethea Dep. at 8–9). He concedes that his hands were raised when he heard "Stop, police" and that he was thinking of jumping. (Rodriguez Dep. at 34–35).[5] Within a matter of seconds, Kicha fired twice from the yard of 7–9 Third Street at a distance of approximately 23 feet.[6] (Rodriguez Dep. at 33–34; Kicha Dep. at 145; Kutchmanich Dep. at 115). Plaintiff was struck in the back left side of the neck and the back of his right shoulder, and fell to the ground. (Kutchmanich Dep. at 84). As a result of the shooting, plaintiff has been rendered quadriplegic. (Knep Dep. at 12).

█ Plaintiff instituted this action against the City of Passaic, its Police Department, Detective Kicha and various

---

3. Officer Williams, who was positioned at the rear of 7–9 Third Street, did not apprehend plaintiff as he ran from the building. Having heard the commotion in the apartment upstairs, Williams ran into the building where, on the ground floor, he encountered Risko running after plaintiff, and ran out the front door of the building in search of plaintiff. (Williams Dep. at 32, 35–36). Williams entered the alleyway from the front of the building and observed Kicha fire a warning shot, but not two subsequent shots. *Id.* at 37–38.

4. It is unclear, at least to the court, whether at this precise point in time, plaintiff was on the doghouse ready to scale the fence (Rodriguez Dep.), on the doghouse ready to scale the garage (Bethea Dep.), or on top of the fence (Kicha Dep.). Given the fact that the events in the yard of 3–5 Third Street were over in a matter of seconds, confusion on this point is not surprising. Neither, I note, is clarification necessary for decision of the motions before the court.

5. At the time of the shooting, plaintiff was unarmed, although a knife was found near the scene. The investigating detective, Detective Kutchmanich, stated that it would have been impossible for plaintiff to have been in possession of the knife at the time of the shooting. (Kutchmanich Dep., at 77–78). No other weapon was discovered either in plaintiff's possession or in the vicinity of the shooting.

6. Kicha fired the gun while it was in "double action" mode, with the result that the two shots were fired instantaneously. (Kutchmanich Dep., at 86).

"John Doe" police officers [7] alleging violations of his First, Fourth, Eighth and Fourteenth Amendment rights under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and violations of his rights under the New York and New Jersey constitutions.[8] Discovery closed on May 1, 1989, and a final pretrial order has been entered. Defendant Kicha now moves for summary judgment asserting qualified immunity and the statute of limitations bar. The City of Passaic and the Police Department assert those grounds and others in support of their motion for summary judgment. For the reasons that follow, defendants' motions will be granted.

## II.

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper procedure for redress....

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but only provides a remedy for a deprivation of rights established elsewhere. *City of Oklahoma City v. Tuttle, supra,* 471 U.S. at 816, 105 S.Ct. at 2432; *Wilson v. Garcia,* 471 U.S. 261, 278, 105 S.Ct. 1938, 1948, 85 L.Ed.2d 254 (1985). In order to state a legally sufficient claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Daniels v. Williams, supra; Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Here, the second requirement is unquestionably met. The parties have stipulated that Kicha was acting under color of state law when she shot plaintiff on January 8, 1978. (Final Pretrial Order, Stipulation of Facts, at 4).

With reference to the first requirement, it is clear that plaintiff's First Amendment rights were not violated; indeed, plaintiff does not even hint as to how the First Amendment was implicated. Likewise, plaintiff is unable to establish a deprivation of rights protected by the Eighth Amendment. The Eighth Amendment proscription of cruel and unusual punishment is implicated "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (quoting *Ingraham v. Wright,* 430 U.S. 651, 671–72, n. 40, 97 S.Ct. 1401, 1412–13, n. 40, 51 L.Ed.2d 711 (1977)); *see Bell v. Wolfish,* 441 U.S. 520, 535, n. 16, 99 S.Ct. 1861, 1872, n. 16, 60 L.Ed.2d 447 (1979). Because plaintiff had not been prosecuted and adjudged guilty of

---

**7.** Plaintiff has not sought to amend the complaint to substitute named defendants for the alleged "John Doe" officers. Where a complaint asserting claims against "John Doe" defendants has not been amended to substitute defendants who are real parties in interest as soon as the identity is known or reasonably should have been known or, in any event, before the close of discovery, such an assertion is mere surplusage and will be disregarded by the court. *See Britt v. Arvanitis,* 590 F.2d 57 (3d Cir.1978) (affirmance of summary judgment for defendant where plaintiff failed to substitute defendant for "John Doe" defendant within statutory limitations period); *see also Hannah v. Majors,* 35 F.R.D. 179, 180 (W.D.Mo.1964). Therefore, this court will only consider the City of Passaic, the City of Passaic Police Department and Detective Kicha as defendants in this action.

**8.** In a letter dated December 15, 1989, plaintiff acknowledges that he is invoking claims only under the New Jersey State Constitution. Art. 1, ¶ 7 of the New Jersey Constitution virtually replicates the Fourth Amendment to the United States Constitution and decision under the latter will be dispositive of the former.

a crime prior to the shooting, Eighth Amendment scrutiny is not appropriate.

 Neither is plaintiff's claim of excessive force any longer cognizable under the due process clause of the Fourteenth Amendment.[9] Section 1983 excessive force claims had at one time had been examined under a rubric of "substantive due process", and it had been held that "quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law." *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir.), *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). The Third Circuit embraced this holding agreeing that a § 1983 excessive force claim is, by definition, a violation of the due process clause of the Fourteenth Amendment. *Curtis v. Everette*, 489 F.2d 516, 518 (3d Cir.), *cert. denied sub nom. Smith v. Curtis*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); *see also Davidson v. O'Lone*, 752 F.2d 817, 821 (3d Cir.1984), *aff'd sub nom. Davidson v. Cannon, supra; Williams v. Mussomelli*, 722 F.2d 1130, 1133 (3d Cir.1983); *Black v. Stephens*, 662 F.2d 181, 188 (3d Cir.), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Polite v. Diehl*, 507 F.2d 119, 124, n. 11 (3d Cir.1974).

The Supreme Court of the United States has recently scrutinized the reasoning employed in *Johnson v. Glick* and rejected the existence of any relationship between excessive force claims and due process rights. *Graham v. Conner, supra*, —— U.S. at ——, 109 S.Ct. at 1869–71. The Court held that *"all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigato-

ry stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* 109 S.Ct. at 1871 (emphasis in original). I note in passing that, even if the holding of *Graham* is applied prospectively only, only one circuit case[10] and no Supreme Court case had held, at the time of the shooting, that the fleeing felon rule at issue in this case, and to which I will turn in a moment, was violative of the Fourteenth Amendment and several courts had held that it was not. Thus, for purposes of Kicha's qualified immunity defense, plaintiff would be unable to show a violation of clearly established Fourteenth Amendment law. *See* Point V, *infra.*

### III.

It is, therefore, under the Fourth Amendment where plaintiff's battle will be won or lost. Presumably because the City of Passaic is where the deep pocket is perceived to be, plaintiff concentrates his efforts against the City and the Department of Police, a claim predicated almost exclusively on Officer Kicha's conduct on the day of the shooting. He complains most vociferously, of what he describes as the "systemic failure" of the City and the Department to adequately train police officers, including Kicha, in the use of deadly physical force. He complains as well, albeit in passing and largely bottomed on his anticipated success on the main claim, of such things as the failure to train Kicha in arrest and apprehension procedures and the failure to have and to follow procedures for a fair and competent investigation.[11] He

---

9. Similarly, plaintiff's allegation of negligence is misplaced. *The due process clause of the Fourteenth Amendment is not implicated by a negligent act of an official causing unintended injury or loss of life. Davidson v. Cannon, supra*, 474 U.S. at 348, 106 S.Ct. at 670; *Daniels v. Williams, supra* 474 U.S. at 336, 106 S.Ct. at 667; *Brown v. City of Clewiston*, 644 F.Supp. 1407, 1413 (S.D.Fla.1986) (claim of negligent failure to train police officer who shot unarmed fleeing felon is not cognizable under § 1983, citing *Polk County v. Dodson, supra*, 454 U.S. at 326, 102

S.Ct. at 454), *aff'd*, 848 F.2d 1534 (11th Cir. 1988).

10. *Mattis v. Schnarr*, 547 F.2d 1007 (8th Cir. 1976) (en banc), *vacated as moot, sub nom. Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977).

11. Even if these subsidiary claims are not dependent on plaintiff's success on the main claim, the one incident alleged of each of these supposed deficiencies is simply not enough. *See City of Canton v. Harris, supra*, —— U.S. at

argues that facts in dispute mandate that defendants' motions for summary judgment be denied.

The initial difficulty with plaintiff's position is that before there can be relief against the City and the Department, there must have been a violation of plaintiff's federally protected rights and that violation must have been occasioned by the existence or enforcement of an impermissible municipal policy. *Polk County v. Dodson, supra,* 454 U.S. at 326, 102 S.Ct. at 454. The alleged violation of federally protected rights on which plaintiff predicates relief is Kicha's action in wrongfully, and without justification, shooting him on January 8, 1978. If Kicha's action inflicted no constitutional injury and the City and the Department were sued only because for whatever reason they were thought to be legally responsible for her action, the City and the Department cannot be liable. *City of Los Angeles v. Heller, supra,* 475 U.S. at 799, 106 S.Ct. at 1573. As *Heller* put it, "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point". *Id.* (emphasis in original). And, certainly, whether as an abstract matter the training program in place was good, bad, or indifferent is a finding that need not and, indeed, should not be made where no constitutional violation has occurred, much less a violation caused by supposed deficiencies in that program. Were it otherwise, plaintiffs could roam freely as knights *errant amici* searching for deficiencies in training programs where no harm has been caused them or anyone else as a result of those programs.

I, therefore, turn to what plaintiff describes as Kicha's use of "deadly physical force". Plaintiff alleges that the force used by Kicha was excessive under the Fourth Amendment and presses an "excessive force claim[ ] as it applies to fleeing felons...." [12] He predicates relief on *Tennessee v. Garner, supra,* which, he argues, should be applied retroactively while arguing, in the same breath, that under the facts of this case there is no need for a retroactive application of *Garner* because all *Garner* did was clarify the applicability of the Fourth Amendment standard in an excessive force claim without reference to the fleeing felon doctrine (Pl.Br. Point III at 7). Be that as it may, it is the fleeing felon doctrine which is repeatedly invoked with plaintiff concluding that the facts surrounding his shooting are in dispute and, therefore, that under "Fourth Amendment law, restated in *Tennessee v. Garner,* a trial [is] required" to determine the issue of qualified immunity and, more specifically, "to determine whether the shooting was ... 1) necessary to defend the officer or 2) the only way to prevent the plaintiff's escape." (Pl.Br. Point III at 9).[13]

■ Apprehension of a fleeing felon by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner, supra,* 471 U.S. at 7, 25, 105 S.Ct. at 1699, 1708; *see also Brower v. County of Inyo,* — U.S. —, —, 109 S.Ct. 1378, 1380, 103 L.Ed.2d 628, 634 (1989); *Graham v. Conner, supra,* — U.S. at —, 109 S.Ct. at 1870-73. In terms of what is constitutionally reasonable, the holding of *Garner,* about which more will be said shortly, *appears* to be that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee*

---

—, 109 S.Ct. at 1209-10. Moreover, there is no allegation that as a result of the procedures utilized in effecting plaintiff's "arrest and apprehension" and in conducting the subsequent investigation plaintiff suffered any damage.

**12.** The pages in plaintiff's brief are not numbered. The above reference is found at what would be page 4 at Point III, and similar references are found thereafter.

**13.** While a theory of self-defense could find some support in Kicha's deposition testimony, defendants do not argue self-defense and I will not consider it.

*v. Garner, supra,* 471 U.S. at 11–12, 105 S.Ct. at 1701–02.

■■ The Fourth Amendment reasonableness inquiry takes into account only the facts and circumstances known to the government actor at the time of his or her action. *Erwin v. County of Manitowoc,* 872 F.2d 1292, 1295 (7th Cir.1989); *Sherrod v. Berry,* 856 F.2d 802, 804 (7th Cir.1988); *Scott v. Henrich,* 700 F.Supp. 498, 505 (D.Mont.1988). For a court to determine the reasonableness of a police officer's action, it "must stand in *his* shoes and judge the reasonableness of his actions based upon the information he possessed and the judgment he exercised in responding to that situation." *Sherrod v. Berry, supra,* 856 F.2d at 804–805 (emphasis in original); *see Scott v. Henrich, supra,* 700 F.Supp. at 505. Knowledge of facts and circumstances gained by the officer after the completion of the act is irrelevant to a determination of the reasonableness of that officer's judgment vis-a-vis the conduct at issue. *Sherrod v. Berry, supra,* 856 F.2d at 805. Therefore, assuming the applicability of *Tennessee v. Garner* to an incident which occurred years before that case was decided, this court must examine Kicha's evolving knowledge and the attendant circumstances leading up to the moment when she fired at plaintiff.

■ Stated somewhat differently, and again assuming the applicability of *Garner,* a determination as to whether the "reasonableness" requirement has been met can be made only after "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Conner, supra,* —— U.S. at ——, 109 S.Ct. at 1871–72 (citing *Tennessee v. Garner, supra,* 471 U.S. at 8–9, 105 S.Ct. at 1699–

1700). This purely objective determination of reasonableness must take into account the "tense, uncertain, and rapidly evolving" nature of police work, which requires split-second decisionmaking with regard to the requisite amount of force to apply in a particular situation. *Graham v. Conner, supra,* —— U.S. at ——, 109 S.Ct. at 1872.

■ While it is not entirely clear whether plaintiff was, in fact, attempting to escape at the precise moment he was shot, it was objectively reasonable for Kicha to so conclude.[14] Indeed, even plaintiff does not allege that, at the moment he was shot, it should have been or even could have been apparent to Kicha that flight had ceased. All he suggests is that he said *to himself,* "Oh, the police is behind me. Let me stop." (Rodriguez Dep. at 32). He concedes, however, that his hands were raised on the fence when Kicha said "Stop, police" and that he was thinking of jumping. *Id.* at 34. He further recalls, "I raised my hands to put them on top of the fence and that's when they shot me...." *Id.* at 30. Cicero Bethea, a resident of 5 Third Street who observed the incident from the window of his apartment, confirmed that when plaintiff was shot, he had his hands raised and was going up—"[h]e was going over, you know, up on top of the building." (Bethea Dep. at 9). There is, therefore, simply no question of fact as to what plaintiff appeared to be doing—fleeing.

Certainly, Kicha cannot have been expected to have read plaintiff's mind regarding any intention to cease flight and, by plaintiff's own admission, there was no visual or audible manifestation of any such intention. Kicha was in pursuit of plaintiff who had raced from the 7–9 Third Street building, vaulted a six-foot chain-link fence into the backyard of 3–5 Third Street, and mounted a doghouse in that backyard on his way to scaling an adjacent fence. His arms were raised preparatory to jumping both before and after Kicha's shout and warning shot, and plaintiff does not sug-

---

**14.** Plaintiff implicitly concedes that it was objectively reasonable for Kicha to believe that he was a felon who had committed a serious crime, and the facts overwhelmingly support that conclusion. Kicha was present when plaintiff fled

immediately after having been identified as a participant in the armed robbery of the Villa Nova Tavern by Pardo, on whom plaintiff had pulled a revolver.

gest that at any time they were raised in an act of surrender or a gesture of submission. It was therefore eminently reasonable for Kicha, a police officer forced to make a split-second decision under stressful conditions, to conclude that plaintiff was about to scale the fence and, thus, that he was in flight at the moment of the shooting.[15] Certainly, there are no material facts to dispute the conclusion that the shooting was "the only way to prevent the plaintiff's escape". (Pl.Br. Point III at 9).

Parenthetically, and in an exercise of caution, I note that the boundaries of constitutionally reasonable conduct are less than clearly delineated in *Tennessee v. Garner* and its progeny. It would appear that the holding in *Garner* provides that deadly force may be used if necessary to prevent the escape of a fleeing felon, which I have found the facts establish plaintiff to have been, "if the suspect threatens the officer with a weapon *or* there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm," and if, where feasible, some warning has been given. *Tennessee v. Garner, supra,* 471 U.S. at 11–12, 105 S.Ct. at 1701–02 (emphasis added). If so, *Garner* is a milestone around plaintiff's neck and not his salvation in that he does not dispute that Kicha had probable cause to believe that he was the armed interloper at the Villa Nova Tavern, where serious physical harm was inflicted, and does not even suggest that it was apparent to Kicha that flight had ceased after a warning which he concedes

had been given. If the "or" in the above-quoted sentence means what it says, my Fourth Amendment analysis would be complete and I would grant summary judgment as to all defendants because plaintiff has not established a cognizable constitutional violation.

The holding of *Garner* is, however, less than clear. The sentence immediately preceding that quoted above suggests that *Garner* would permit the use of deadly force against a fleeing felon only where there is a present, rather than a past or future, threat of serious harm to the officer or other members of the community. *Garner, supra,* 471 U.S. at 11, 105 S.Ct. at 1701. In this event, plaintiff would succeed in establishing a *prima facie* Fourth Amendment violation, allowing him to proceed next to the obstacle of the retroactive application of *Garner,* because it is uncontested, at least for purposes of this motion, that he was unarmed at the time of the shooting. Discretion being the better part of valor, I will assume that *Garner* requires a present threat of serious harm and that summary judgment should be denied if *Garner* is applicable to this case. It is to that issue that I now turn.

## IV.

■ *Garner,* of course, was decided in 1985 and turned its back on the common law rule which authorized the use of deadly force if necessary to apprehend even a non-dangerous fleeing felon, a rule which was still accepted by almost half of the states, including New Jersey,[16] and a rule

---

**15.** It is critical to stress the split-second nature of what transpired. There is no suggestion that it took more than mere seconds for plaintiff to vault the fence, climb into the yard, climb onto the doghouse preparatory to scaling a second fence, and be shot. While with the luxury of hindsight one can parse each discrete act within those mere seconds and analyze each as if under a microscope, as I have done, one must not lose sight of the fact that Kicha had no such luxury and was forced to act in the blink of an eye.

**16.** As of January 8, 1978, the New Jersey Penal Code, in conformity with the common law rule, permitted a police officer to use deadly force to apprehend a non-dangerous fleeing felon. N.J. S.A. 2A:113–6 (1978) (repealed effective September 1, 1979). This basic rule did not substantial-

ly change when the Penal Code was superceded by the Criminal Justice Code. Effective September 1, 1979, the use of deadly force is justified if:

(a) [t]he actor effecting the arrest is authorized to act as a peace officer ...; and

(b) [t]he actor reasonably believes that the force employed creates no substantial risk of injury to innocent persons; and

(c) [t]he actor reasonably believes that the crime for which the arrest is made was homicide, kidnapping, ... arson, robbery, burglary of a dwelling, or an attempt to commit one of these crimes; and

(d) [t]he actor reasonably believes [t]he use of deadly force is necessary to prevent an escape.

which plaintiff virtually concedes would defeat his claim. Plaintiff, not surprisingly, argues that *Garner* should be applied retroactively to his 1978 shooting—although, as noted above, he may well have difficulties even under *Garner*—and defendants, also not surprisingly, argue that it should be applied prospectively only.

It should be stressed that if *Garner* broke from prior precedent and established a new standard, not only could plaintiff not avail himself of that standard but, by definition, he would be unable to show that Kicha, years earlier, violated law which only became clearly established in 1985. It does not necessarily follow, however, that if *Garner* was *not* a clear break from prior precedent, the standard which it explicated was "clearly established" in 1978, when plaintiff was injured—or even in 1985, when *Garner* was decided—for purposes of holding Kicha liable for failure to comply with that standard. Clarity as concerns a constitutional rule is significantly different for purposes of retroactivity and purposes of immunity, a difference plaintiff has not discerned.

I turn to whether *Garner* should be applied retroactively or prospectively, an issue of first impression in the Third Circuit. Four circuits have analyzed the issue, with the Second and the Eleventh Circuits holding that *Garner* should be applied retroactively, *see Davis v. Little*, 851 F.2d 605 (2d Cir.1988); *Acoff v. Abston*, 762 F.2d 1543 (11th Cir.1985), and the Sixth and Tenth Circuits holding that *Garner* should be applied prospectively only. *See Carter v. City of Chattanooga*, 850 F.2d 1119 (6th Cir.) (en banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989); *Mitchell v. City of Sapulpa*, 857 F.2d 713 (10th Cir.1988). The remaining circuits

have simply assumed, without discussion, the retroactivity of *Garner* or simply relied on *Garner* for a framework of Fourth Amendment analysis without retroactively applying its holding.[17]

Retroactive application is not compelled, constitutionally or otherwise. *Solem v. Stumes*, 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984). Retroactivity in criminal cases is governed by the standard enunciated in *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), while retroactivity in civil cases, as here, is controlled by the standard announced in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). *Griffith v. Kentucky, supra*, 479 U.S. at n. 8, 107 S.Ct. at 713 n. 8; *United States v. Johnson*, 457 U.S. 537, 550–51 & n. 12, 563, 102 S.Ct. 2579, 2587, & n. 12, 2594, 73 L.Ed.2d 202 (1982).

In *Chevron Oil Co. v. Huson*, the Supreme Court established a three-part test for determining the retroactive application of a judicial decision: (1) "the decision to be applied retroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed"; (2) the court "must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect and whether retrospective operation will further or retard its operation;" and (3) the court "must weigh[ ] the inequity imposed by retroactive application." *Chevron Oil Co. v. Huson, supra*, 404 U.S. at 106–107, 92 S.Ct. at 355–56.

The constitutional analysis in *Garner*, 710 F.2d 240 (6th Cir.1983) was novel and a clear break from what had gone before.

---

N.J.S.A. 2C:3–7(b)(2). Thus, under New Jersey's Criminal Code, there is no express requirement that the suspect threaten the officer or others with serious physical harm or that there be probable cause to believe that the suspect committed a violent crime involving the infliction or the threatened infliction of serious bodily harm.

**17.** *See, e.g., Ford v. Childers*, 855 F.2d 1271, 1273–76 (7th Cir.1988); *Martin v. Gentile*, 849 F.2d 863, 868–70 (4th Cir.1988); *Martin v. Mal-*

*hoyt*, 830 F.2d 237, 261–62 (D.C.Cir.1987); *Smith v. City of Fontana*, 818 F.2d 1411, 1416 (9th Cir.), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987); *United States v. Bigham*, 812 F.2d 943, 948 (5th Cir.1987); *Kibbe v. City of Springfield*, 777 F.2d 801, 808 (1st Cir.), *cert. dismissed*, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987); *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir.), *cert. denied*, 485 U.S. 264, 108 S.Ct. 1253, 99 L.Ed.2d 288 (1988).

At common law, the power of a police officer to apprehend a fleeing felon with deadly force was unqualified by notions of reasonableness. Although the social trend at the time of the *Garner* decision may have been moving toward repeal of the fleeing felon rule, the legal trend tended more to the *status quo. Mitchell v. City of Sapulpa, supra,* 857 F.2d at 718 (citing *Tennessee v. Garner, supra,* 471 U.S. at 15–19, 105 S.Ct. at 1703–05); *see generally* Annotation, *Modern Status: Right of Peace Officer to Use Deadly Force in Attempting to Arrest Fleeing Felon,* 83 A.L. R.3d 174 (1978).

Presumably, any legal trend would have tended even more to the *status quo* years earlier when plaintiff was shot. Certainly, prior to the Sixth Circuit's 1983 decision in *Garner II,* no circuit court had declared that the common law rule on the use of deadly force, codified or uncodified, either violated the Fourth Amendment or did not violate the Fourth Amendment. Indeed, when the Supreme Court decided *Garner,* only the Sixth Circuit in *Garner II* and the Eighth Circuit in *Mattis v. Schnarr, supra,* 547 F.2d at 1017, and *Landrum v. Moats,* 576 F.2d 1320 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978), had expressly held under *any* amendment that the fleeing felon rule was unconstitutional, only *Mattis* had so held at the time plaintiff was shot and so held under the Fourteenth Amendment, and every other court which had considered the rule had upheld it. Thus, when the *Garner* decision affirmatively linked the fleeing felon rule and the Fourth Amendment reasonableness requirement, the Court was essentially writing on a clean slate. As the Sixth Circuit put it: "A review of the fleeing felon rule's history indicates that *Garner* overturned 'a longstanding and widespread practice' the Supreme Court had previously not addressed, 'but which a near-unanimous body of lower court authority ha[d] expressly approved.'" *Carter v. City of Chattanooga, supra,* 850 F.2d at 1123 (quoting *United States v. Johnson, supra,* 457 U.S. at 551, 102 S.Ct. at 2588).

Recognition by legal commentators that *Garner* broke new legal ground was universal and they noted, virtually without exception, that the *Garner* standard represented a novel application of the Fourth Amendment. *See, e.g., The Supreme Court—Leading Cases,* 99 Harv.L.Rev. 120, 248 (1985) ("The case was unexpected ... because the federal and state courts have been almost unanimous in upholding similar deadly force rules. The case also charted new territory...."); Comment, *Tennessee Code Section 40–7–108 Authorizing the Use of Deadly Force by Police Officers Against an Unarmed Suspect of a Nonviolent Felony is Unconstitutional under the Fourth and Fourteenth Amendments—Garner v. Memphis Police Department,* 710 F.2d 240 (6th Cir.1983), 52 U.Cin.L.Rev. 1154, 1159, (1983) (*Garner II* is a "bold and pioneering step"). The dissenting justices in *Garner* observed that "[t]he Court's opinion sweeps broadly to adopt an entirely new standard for the constitutionality of the use of deadly force to apprehend fleeing felons." *Garner, supra,* 471 U.S. at 32, 105 S.Ct. at 1712 (O'Connor, J., dissenting). There is no question that the *Garner* court's application of a Fourth Amendment reasonableness requirement to the fleeing felon rule decided an issue of first impression, the resolution of which was not clearly foreshadowed.

Certainly, retroactive application of *Garner* would neither facilitate its purpose nor further its operation. The purpose of what I am assuming the *Garner* standard to be is to deter police officers from using deadly force to apprehend fleeing felons who do not pose an immediate threat to the officer, bystanders or the general public. *See Mitchell v. City of Sapula, supra,* 857 F.2d at 719. While compensation to victims of constitutional violations is an important enforcement mechanism, it is collateral to, and should not be confused with, the primary purpose of deterrence. *Id.; Carter v. City of Chattanooga, supra,* 850 F.2d at 1130. Application of *Garner* to causes of action arising before 1985 will have no appreciable deterrent effect, but will rather serve as a blow to the morale of

police officers who, without a reasonable basis for questioning the constitutionality of existing law, were somehow expected to predict subsequent changes in the law.

For the same reason, a balance of the equities favors only prospective application of *Garner*. Plaintiff undeniably has a strong interest in compensation. However, retroactive application of the *Garner* standard would penalize law enforcement practices that were constitutionally sound at the time they were undertaken. *Carter v. City of Chattanooga, supra,* 850 F.2d at 1131 (citing *Pembaur v. City of Cincinnati, supra,* 475 U.S. at 494–95, 106 S.Ct. at 1306–07 (Powell, J., dissenting)); *accord Mitchell v. City of Sapulpa, supra,* 857 F.2d at 720. Under these circumstances, the potentially incapacitating financial burden which retroactivity of *Garner* would place upon government officials and municipalities must outweigh a plaintiff's interest in compensation.

"Whatever the provision of the Constitution that is at issue, I continue to believe that 'fidelity to the notion of *constitutional*—as opposed to purely judicial—limits on governmental action requires us to impose a heavy burden on those who claim that practices accepted when [the provision] was adopted are now constitutionally impermissible.'" *Wallace v. Jaffree,* 472 U.S. 38, 79–80, 105 S.Ct. 2479, 2501–02, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring) (citing *Tennessee v. Garner, supra,* 471 U.S. at 26, 105 S.Ct. at 1709 (dissenting opinion) (emphasis in original)). Plaintiff has not sustained that burden here, and does not seriously argue that, absent *Garner,* the common law rule with reference to fleeing felons would afford him relief.

## V.

If I am correct in my conclusion that *Garner* established a new principle of law, it follows inexorably that Kicha's motion for summary judgment on the basis of qualified immunity should be granted, for a new principle of law cannot at the same time be "clearly established" and certainly cannot have been "clearly established" years earlier.

But even if *Garner* is applied retroactively, the result is the same. The Eleventh Circuit, while finding in *Acoff v. Abston, supra,* 762 F.2d at 1549, that *Garner* should be given retroactive effect, nonetheless held in *Hamm v. Powell,* 874 F.2d 766, 771 (11th Cir.1989), that because, three years before the *Garner* decision, the officers could reasonably have believed that the conduct in which they engaged did not violate clearly established statutory or constitutional rights, qualified immunity was appropriate.

■ Qualified immunity is predicated upon the "objective legal reasonableness" of an official's conduct, and is warranted where that official has not violated clearly established statutory or constitutional rights. *Harlow v. Fitzgerald, supra,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39;[18] *Ryan v. Burlington County,* 889 F.2d 1286, 1292 (3d Cir.1989); *Lee v. Mihalich,* 847 F.2d 66, 69 (3d Cir.1988). A constitutional right is "clearly established" only where it is "sufficiently clear" that the objectively reasonable official, in hindsight, would have understood that his or her conduct violated that right, *i.e.* the unlawfulness would have been apparent in light of

---

**18.** Although the shooting occurred before the *Harlow* decision supplanted the bifurcated qualified immunity standard in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), *Harlow* is applied retroactively. Virtually every reported federal decision considering the retroactivity of *Harlow* of which this court is aware found in favor of retroactivity. *See Ramirez v. Webb,* 835 F.2d 1153, 1156 (6th Cir. 1987); *Windsor v. The Tennessean,* 719 F.2d 155, 163, n. 10 (6th Cir.) *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984); *Alexander v. Alexander,* 706 F.2d 751, 754 (6th Cir.1983); *Scott v. Plante,* 691 F.2d 634, 639 (3d Cir.1982)

(*sub silentio* ); *Kostiuk v. Town of Riverhead,* 570 F.Supp. 603, 612 (E.D.N.Y.1983); *Hauptmann v. Wilentz,* 570 F.Supp. 351, 370, n. 19 (D.N.J.1983) *cert. denied,* 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); *Dyson v. Kocik,* 564 F.Supp. 109, 113, n. 2 (M.D.Pa.1983); *Roman v. Appleby,* 558 F.Supp. 449, 455, n. 4 (E.D.Pa.1983); *Druckenmiller v. United States,* 553 F.Supp. 917, 919 (E.D.Pa.1982). The only federal decision that declined to apply *Harlow* retroactively has since been vacated. *Strathie v. Dep't of Transp., Commonwealth of Pennsylvania,* 547 F.Supp. 1367, 1378, n. 7 (E.D.Pa.), *vacated,* 716 F.2d 227 (1983).

existing law. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *Lee v. Mihalich, supra,* 847 F.2d at 69, 71; *see Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). The burden of showing that the constitutional right was clearly established at the time of the conduct at issue rests with the plaintiff. *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984).[19]

The crux of the qualified immunity inquiry here is whether the Fourth Amendment right of a fleeing felon to be free from the seizure of his person by means of an unreasonable use of deadly force, as enunciated in *Garner,* was "clearly established" when plaintiff was shot on January 8, 1978. All of the foregoing should indicate without any question that it was not. *See Hamm v. Powell, supra,* 874 F.2d at 771.

I note in passing that the history of the fleeing felon rule in New Jersey reveals an unbroken string of precedential support lasting for over a century. The rule was first mentioned in state legal annals as part of a grand jury charge:

> If a police officer having lawfully made an arrest, and using proper means for that purpose, be resisted, he may lawfully repel force by force, in order to prevent an escape, and if the person making resistance is unavoidably killed in the struggle, the homicide is justifiable. And in cases where the charge is felony, the killing of the accused before the arrest is actually made will be justifiable, if in no other way the escaping felon could be taken. If in the pursuit the felon be killed when he cannot be otherwise overtaken, the homicide is justifiable.

*Charge to a Grand Jury,* 9 N.J.L.J. 167, 168 (1886) (Depue, J.). Indeed, the rule was so firmly entrenched that it was not again mentioned in reported decisions until the 1950's when, citing Justice Depue, it was twice reaffirmed. *Davis v. Hellwig,* 21 N.J. 412, 416, 122 A.2d 497 (1956); *Noback v. Town of Montclair,* 33 N.J.Super. 420, 427, 110 A.2d 339 (Law Div.1954). In one of those decisions, Justice Brennan, then a Justice of the Supreme Court of New Jersey, dispelled any notion that the fleeing felon rule applied only to felonies recognized at common law by linking the rule to the state statutory scheme of misdemeanors and felonies. *See Davis v. Hellwig, supra,* 21 N.J. at 416–17, 122 A.2d 497.

Up until the *Garner* decision itself, the rule continued to be so firmly entrenched that within two weeks of that decision, then-Attorney General of the State of New Jersey Irwin I. Kimmelman distributed emergency modifications on the use of force to be brought to "the immediate attention of all representatives of the law enforcement community" in light of the "significant" *Garner* decision which "necessitate[d] an immediate revision of law enforcement policies on this subject." (Aste Aff. at Exh. H–4). Certainly, at the time of the shooting in 1978, there was no basis for Kicha to doubt the constitutionality of the fleeing felon rule as codified and clearly established in New Jersey. *See supra* note 16.

Applying the "objective legal reasonableness" standard established in *Harlow* and fine-honed in *Anderson v. Creighton,* Kicha could reasonably have believed that she was justified in shooting plaintiff. Even assuming the retroactivity of *Garner,* an assumption made with the greatest of difficulty, Kicha is entitled to qualified immunity.

Because Kicha has not violated plaintiff's constitutional rights, there is, as discussed at pp. 1320–21 *supra,* no basis for a finding

---

**19.** Due to the objective nature of the analysis, a qualified immunity claim is appropriately resolved on a motion for summary judgment. *Harlow v. Fitzgerald, supra,* 457 U.S. at 818, 102 S.Ct. at 2738; *Ryan v. Burlington County, supra* 889 F.2d at 1292; *see Mitchell v. Forsyth, supra,* 472 U.S. at 526, 105 S.Ct. at 2815. On summary judgment, a district court judge has the authority to determine not only the constitutional standard applicable to a plaintiff's § 1983 claim, but whether that standard was "clearly established" at the time of the defendant's conduct. *Harlow v. Fitzgerald, supra,* 457 U.S. at 818, 102 S.Ct. at 2738; *Ryan v. Burlington County, supra,* 889 F.2d at 1292.

of liability against the remaining defendants. Liability under § 1983 is derivative; where its agent or employee is exonerated as to acts for which a municipal corporation is allegedly responsible, so, too, is the municipal corporation.

> [T]his was an action for damages, and neither *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the [court] has concluded that the officer inflicted no constitutional harm.

*Heller v. City of Los Angeles, supra*, 475 U.S. at 799, 106 S.Ct. at 1573. Therefore, the absence of § 1983 liability against Kicha requires a finding that there is no § 1983 liability against the City of Passaic or its Police Department.[20]

### CONCLUSION

Plaintiff has come forward with much too little and has come forward, most likely, much too late. While the injuries he has borne and will bear warrant both sympathy and concern, relief is simply not warranted. Defendants' motions for summary judgment will be granted. An appropriate order will issue.

---

20. Given the disposition herein, none of the other issues raised by defendants, such as punitive damages and the applicability of the delib-erate indifference standard, need be decided by the court.