Vanessa ABRAHAM, in her own right and as Administratrix of the Estate of Robert Abraham, deceased, and on behalf of Robert Christopher Abraham, Jr., Labreea Von Abraham and Taquan Carey, the minor children of decedent, Plaintiff,

v.

Kimberly RASO, et al., Defendants.

Kimberly RASO and Joris Hoogendoorn, Plaintiffs,

v.

The ESTATE OF Robert C. ABRAHAM, et al., Defendants.

Nos. CIV.A. 96–4884(JEI), CIV.A. 96–5146(JEI).

United States District Court, D. New Jersey.

March 5, 1998.

Popper & Yatvin by Diane R. Brocco, Edison, for plaintiff Abraham.

Mario A. Iavicoli by Mario A. Iavicoli, Haddonfield, NJ, for defendant Raso.

Kotlikoff, Littlefield & Fishman by Louis J. Kotlikoff, Audobon, NJ, for plaintiffs Raso and Hoogendoorn.

Poplar & Eastlack, P.C. by Jeffrey A. Ahren, Turnersville, NJ, for defendant Township of Cherry Hill.

Archer & Greiner, P.C. by Frank D. Allen, Haddonfield, NJ, for defendants Cherry Hill Center, Inc., The Rouse Co., and The Rouse Co. of New Jersey, Inc.

Lester Schwab Katz and Dwyer by Robert Dunn, Millburn, NJ, for defendants Macy's East, Inc.

Hoagland, Longo, Moran, Dunst & Doukas by John C. Simons, New Brunswick, NJ, for intervening plaintiff CNA Insurance Co.

Law Offices of Sue Ellen Johnson by Lewis K. Jackson, Marlton, NJ, for intervening defendant Liberty Mutual Insurance Co.

## OPINION

IRENAS, District Judge.

## I. INTRODUCTION [1]

On October 15, 1994, in the early evening, Robert Abraham and his cousin, Dennis Redding, were observed stealing clothing from the men's department in Macy's department store in the Cherry Hill Center ("the Mall") in Cherry Hill, New Jersey. One Macy's guard followed Abraham and Redding out of Macy's and into the Mall parking lot. Another Macy's guard called Mall security for back-up assistance. Mall security called the off-duty Cherry Hill police officers working at the Mall as security guards. One of the two officers responding was Kimberly Raso.

The shoplifting suspects walked through the parking lot towards their car while Mall security, Raso and another off-duty police officer approached the scene. In a rapidly evolving sequence of events, Abraham was able to get into the driver seat of his car before he could be apprehended. Abraham put the car into reverse and backed out abruptly and at a high rate of speed, slamming his car into a parked car in the process. Raso, now in front of the car, ordered Abraham repeatedly to stop and to get out of the car. At some point Abraham pressed his foot down on the accelerator and drove forward towards Raso. Raso, who had drawn her gun as the car moved towards her, jumped to her right while being hit or nearly hit by the car, and fired a shot which shattered the driver-side window. The bullet struck Abraham in his left arm, passed through his arm and entered his chest, fatal-ly wounding him. Abraham's car swerved to the right and continued through the parking lot before striking another car, ramming into a parking lot island curb, hitting a sign and a small tree and coming to a rest. Abraham apparently was pronounced dead after his arrival at Cooper Hospital.

Vanessa Abraham ("plaintiff"), in her own right, as Administratrix of the Estate of Robert Abraham, and on behalf of Robert Abraham's children, Robert, Labreea and Taquan, has filed a complaint pursuant to 42 U.S.C. § 1983 alleging that Raso and the Township of Cherry Hill violated Abraham's Fourth Amendment and Fourteenth Amendment right to be free from unreasonable seizures. In addition, plaintiff alleges that Raso, the Cherry Hill Center, Inc., the Rouse Company of New Jersey, Inc., the Rouse Company, and Macy's East, Inc. are liable for various forms of negligence under New Jersey state law. Plaintiff also seeks punitive damages against all defendants except the Township of Cherry Hill.

Raso and her husband, Joris Hoogendoorn, have filed a complaint alleging that the Estate of Robert Abraham and Vanessa Abraham are liable to them for negligent actions which have caused harm to Raso and Hoogendoorn. Raso and Hoogendoorn also allege that Macy's East, Inc. is liable to them based upon negligent conduct.[2]

CNA Insurance Company ("CNA") has filed an intervening complaint in this action. CNA's complaint seeks a judgment that Raso is not covered under the terms of the uninsured-motorist provision of her CNA automobile insurance policy for injuries arising out of the October 15, 1994, shooting incident. CNA has named Liberty Mutual Insurance Company ("Liberty Mutual") as a third-party defendant, alleging that Liberty Mutual will be liable to CNA—under the terms of the Rouse Company's Liberty Mutual insurance policy—for a portion of any payment CNA might be required to make to Raso in the

---

**1.** This brief introduction provides only a rough undisputed narrative of the events surrounding the fatal shooting of Robert Abraham. The evidence is discussed more thoroughly below.

**2.** Raso's and Hoogendoorn's action has been consolidated with plaintiff's action.

event she is deemed to be covered for her injuries under her CNA policy.

This Court has jurisdiction over Raso's constitutional claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Now before this Court are a number of motions for summary judgment filed by the parties.[3]

As will become evident, this Court's core holding is that Raso's use of deadly force against Abraham was justified as a matter of law because Raso reasonably believed that Abraham was a dangerous fleeing criminal who had threatened her life and who posed an immediate threat of serious harm to the public. For the reasons set forth below, this Court will: (1) grant Raso's motion for summary judgment on plaintiff's § 1983 excessive force claim; (2) grant the Township of Cherry Hill's motion for summary judgment as to plaintiff's § 1983 claims; (3) grant Raso's, the Cherry Hill Center's, the Rouse Company of New Jersey, Inc's, the Rouse Company's and Macy's East, Inc.'s motions for summary judgment as to plaintiff's assault and battery claims; (4) grant Raso's, the Cherry Hill Center's, the Rouse Company of New Jersey, Inc.'s, the Rouse Company's and Macy's East, Inc.'s motions for summary judgment as to plaintiff's negligence, gross negligence and negligence *per se* claims; (5) grant the Cherry Hill Center's, the Rouse Company of New Jersey, Inc.'s, the Rouse Company's and Macy's East, Inc.'s motions for summary judgment as to plaintiff's negligent hiring claim; (6) grant the Cherry Hill Center's, the Rouse Company of New Jersey, Inc.'s, the Rouse Company's and Macy's East, Inc.'s motions for summary judgment as to plaintiff's negligent supervision claim; (7) grant Raso's, the Cherry Hill Center's, the Rouse Company of New Jersey, Inc's, the Rouse Company's and Macy's East, Inc.'s motions for summary judgment as to plaintiff's punitive damages claim; (8) grant Macy's East, Inc.'s motion for summary judgment as to Raso and Hoogendoorn's negligence claim; (9) grant CNA's motion for summary judgment as to Raso's non-cover-age under the uninsured-motorist provision of Raso's CNA insurance policy, and deny Raso's cross motion for summary judgment; and (10) grant Liberty Mutual's motion for summary judgment as to Raso's non-coverage under the uninsured-motorist provision of the Rouse Company's Liberty Mutual Insurance policy.

## II. BACKGROUND

On Saturday, October 15, 1994, in the early evening, Robert Abraham and Dennis Redding were taking clothes from the men's department at Macy's and stuffing them into bags. Macy's security guard Mary Jane Thomulka observed this activity on Macy's security monitors. Thomulka alerted another Macy's security guard, Shawn Waters. Waters began to follow Abraham and Redding through Macy's and, as he followed them out of the store and out of the Mall, he radioed Thomulka and directed her to call Mall security for back-up assistance. Thomulka contacted Mall security guard Carmen Inverso. Inverso put out a call for the off-duty Cherry Hill police officer(s) working as Cherry Hill Mall security officers.

There were two off-duty Cherry Hill officers working in the Mall when Inverso made this call: Kimberly Raso and David Washick. Raso acknowledged Inverso's call, reporting that she already was near Macy's. She says she was "advised" over the radio "that the [suspects] were possibly intoxicated or under the influence." (Dep. of Kimberly Raso at 297). Washick responded to the call and moved towards the Macy's exit at the southeastern corner of the Mall parking lot. Waters, meanwhile, flagged down Mall security guard Gary Saraceni who was driving a Mall security pick-up truck, and joined Saraceni in that vehicle in order to follow or observe Abraham and Redding. Mall security guard Eriberto Aviles also moved towards the scene.

After Abraham and Redding exited Macy's, they began making their way to a car parked in aisle sixty-eight, northwest of the Macy's exit, in the crowded Mall parking lot. Initially they walked together, but soon they

---

**3.** By stipulation the defendants in the original action brought by plaintiff Vanessa Abraham have agreed to dismiss all cross claims against each other.

separated and walked apart. Raso and Aviles, who had joined together at some point, similarly walked together and then apart in order to follow and approach Abraham and Redding from different directions. Abraham's car was parked facing west in a lined-off parking space in a row of parked cars. Redding moved towards the passenger-side front door while Abraham approached the driver-side front door. Aviles attempted to grab Abraham, but Abraham was able to open the driver-side door and get into the car. Redding then attempted but was unable to enter the car by the front passenger-side door.

As these events unfolded, Raso was approaching Abraham's car from the southeast. As she approached, Raso apparently commanded Abraham not to enter the car or to exit the car. She was advancing towards the driver-side door but was still at the rear driver-side of the car when Abraham got in the car. Abraham started his car, put it in reverse, and accelerated abruptly, backing his car out of the lined-off parking space in an east-southeast direction. By the time Abraham backed out, Raso had reached the rear end of the car's driver-side. Raso says the car backed up fast and she "had to jump out of the way." (Dep. of Raso at 320). Another witness has said that Abraham was driving the car "out of control" at this point. (Dep. of Shawn Waters at 62). Abraham backed his car across the parking lot aisle and slammed into the rear of a Ford Mustang ("the Mustang") parked behind his car. One witness says the Mustang actually was moved from its spot by the force of the impact. (*Id.* at 63). Another witness has stated that Abraham's car "banged into someone's car really bad." (Grand Jury Testimony of Lisa Brittingham at 100).[4] Both the Mustang and Abraham's car sustained minor damage in the collision. (*See* Photographs, Abraham's Brief in Opp. to Cherry Hill Ctr. et al.'s Motion for Summary Judgment, Ex. 8). Abraham pulled forward after hitting the Mustang, backed up again—clearing the Mustang—and stopped. After this maneuver, the front of his car was pointing northwest.

Within a matter of seconds after Abraham had backed up his car, hit the Mustang, pulled forward, and backed up again, Raso was situated in front of Abraham's car, if not directly in front of the center of Abraham's car, then slightly towards the driver-side.[5] Raso began slowly to move closer to the car, at all times remaining in front of the car, and commanding Abraham to exit and to stop. One witness estimates that Raso commanded Abraham to get out of the car eight to ten times. "The first couple times ... he kept inching the car forward at her." (Dep. of Gary Saraceni at 64). At some point Raso stopped moving forward and began to back up slowly from Abraham's car. Abraham was inching his car towards Raso, then stopping, then inching forward. Based on the accounts of all witnesses whose views of Raso were not obstructed at this point, it is clear that Raso was in the car's path and that her ability to get out of its way appeared to be limited owing to the closeness of other parked cars, the narrowness of the aisle and the width of Abraham's car.

According to Raso, "[i]t was like—he kept inching and inching up towards me. And it was a standoff. And I was looking to go— and I couldn't get out of his way." (Dep. of Raso at 342). She perceived that the parked cars blocked her escape to the right, and that moving left would have put her more square-

---

4. All citations to Grand Jury testimony of various witnesses in this case are citations to the transcript of the April 7, 1995, Camden County Grand Jury proceeding entitled "In the Matter of the Death of Robert Abraham." The transcript appears in the record as Exhibit 1 to Raso's Brief in Opposition to CNA's Motion for Summary Judgment and in Support of Raso's Cross Motion for Summary Judgment.

5. At this point in time, the location of the witnesses were as follows. Saraceni and Waters were in the Mall security pick-up truck, fifteen to twenty feet from Raso and five to six feet from the rear of Abraham's car, in aisle sixty-eight. Avilez was standing near where Abraham's passenger-side door had been before Abraham exited his parking space. Officer Washick was 150–200 yards away, heading towards the scene on foot from the southeastern part of the lot. William Duhart and Lisa Brittingham were seated in a parked car, an aisle away, with a row of parked cars between them and Abraham's car, and with both that row of parked cars and Abraham's car between them and Raso.

ly in front of the advancing car. (*Id.* at 343). One witness describes how, after Raso told Abraham six or seven times to leave the car, Raso drew her weapon, pointed it at Abraham's car, and said: "Please, please don't make me do this. Just get out. Just shut the car off. Get out of the car. Please, don't make me do this. She was pleading with him." (Dep. of Saraceni at 65–66). Raso remained in front of the driver-side headlight with her gun "definitely pointed at the windshield." (*Id.* at 66). Raso says that Abraham stopped for "half a second" and looked at her: "Our eyes. Just—he looked right at me. And all I heard and saw was he slammed the accelerator to the floor. And I could see him go back as one would when the vehicle excels, and you're sitting in the driver's seat." (Dep. of Raso at 344). Saraceni states that "[a]fter about the fourth plea from Officer Raso, I heard a distinct sound of Abraham's foot hitting the floorboards in the car, like stomping down on the accelerator. The car lunged forward. It didn't spin the wheels or anything." (Dep. of Saraceni at 66). "In my opinion, I was given the impression that, you know, it was a.... He knew what he was doing. He was getting out of there and he wasn't stopping. And if she was in the way it was too bad. He was going to run her down." (Grand Jury Testimony of Gary Saraceni at 114). Similarly, Waters has described how Abraham "accelerated from a high rate of speed from where he struck the first car and aimed his vehicle directly at her." (Dep. of Waters at 66). "The driver of that vehicle definitely intended to hit Officer Raso. The vehicle was aimed right at her and he accelerated at a high rate of speed directly in her direction." (Grand Jury Testimony of Shawn Waters at 118). Raso has stated consistently that "[Abraham] was determined he was going to run me over," (Transcribed 10/31/94 Statement of Raso to Police Investigator Edward Slimm, Raso's Brief in Opp. to CNA's Motion for Summary Judgment and in Support of Raso's Cross Motion for Summary Judgment, Ex. H at 17; *see id.* at 9), that he "had every intention of running me over," and that "this man was going to kill me, and he was going to leave me there," (Grand Jury Testimony of Kimberly Raso at 54).

A second or split-second after Abraham accelerated towards Raso, Raso fired a single round as she jumped to her right. Saraceni says that "[w]hen Officer Raso fired the shot, everything was in motion. So she was moving out of the way. She was being struck at the same time. The car was moving forward. And the shot was fired at that point." (Dep. of Saraceni at 70). Waters says, "it appeared that [the car] was right on top of her. From what I saw, it appeared that her legs were underneath the driver's side, the front driver's side tire of that vehicle. She was on an angle heading down towards the ground. The vehicle had struck her. And she was going down, and one round was discharged from her gun into the driver's side window." (Dep. of Waters at 74).

Despite this testimony, it is not certain whether, as she fired her gun, Raso actually was "hit" by the car, "caught" on the hood, or simply carried off to her right by the momentum of her jump. But it is undisputed that Raso fired her gun within an instant of the impact or near-impact as she jumped out of the car's path, and that the bullet shattered the driver-side window. The bullet struck Abraham in the back of his left arm, traveled through his arm and armpit, entered his chest at a slight front-to-back and downward trajectory, causing what proved to be a fatal wound. Raso regained her equilibrium and, after ascertaining that Avilez had Redding under control, Raso began to run after Abraham's car. His car collided with another car and a parking island before clearly going completely out of control, hitting a sign and a tree and then coming to rest with Abraham slumped unconscious over the wheel.

Prior to October 15, 1994, Raso had been the subject of several citizen complaints alleging improper conduct which ranged from discourtesy to assault and battery. She also had been disciplined for acts of insubordination including "mouthing off" at roll call, getting in verbal altercations with other officers, and appearing at roll calls in a gym suit and going to her gym when she was supposed to be on patrol. Additionally, Raso's authorized secondary employment hours had been limited in early 1991 due to concerns about stress and fatigue. At the time of the

shooting, Raso had been receiving treatment for psychological problems relating to depression, anxiety and panic which had bothered her for years. She was taking prescribed medication on a daily basis as part of her treatment. The Township of Cherry Hill Police Department was aware of her problems and her treatment. On several occasions the Police Department had consulted with Raso's treating mental health professionals and had been advised that Raso's problems and medication would not render her unfit to perform her police duties.

According to Raso, as a result of the October 15, 1994, shooting, she has developed post-traumatic stress disorder syndrome symptoms and other psychological problems and has become unable to work. The New Jersey Division of Pension appears to have made a formal determination that Raso is disabled owing to her psychological problems.

## III. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

▆▆▆ The substantive law governing the dispute will determine which facts are mate-

rial, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* 477 U.S. at 248, 106 S.Ct. 2505. Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring). If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890–91 (3d Cir.1992).

## IV. DISCUSSION

### A. *Excessive Force*

The First Count of Vanessa Abraham's ("plaintiff") complaint states a claim against Raso under 42 U.S.C. § 1983 for use of excessive force.[6] Raso has moved for summary judgment on this claim.

> Section 1983 provides a remedy for the violation of federal constitutional or statutory rights. *Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). To establish a prima facie case under § 1983, a plaintiff must show: "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Id.* (citing *Gomez v. Tole-*

---

6. Although the First Count employs the phrase "actions shocking to the conscience," there is no indication that plaintiff is stating a claim against

Raso for an independent Fourteenth Amendment violation based on actions alleged to have shocked the conscience.

*do,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)).

*Williams v. Lacombe,* Civ. No. 94–7046, 1996 WL 84257, at *3 (E.D.Pa. Feb. 27, 1996) (footnote omitted).[7]

### 1. Under Color of State Law

 Raso cannot be held liable under § 1983 unless she acted under color of state law.

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1042–43, 85 L.Ed. 1368 (1941)). Accordingly, acts of a state or local employee in her official capacity will generally be found to have occurred under color of state law. *Id.*

*Barna v. City of Perth Amboy,* 42 F.3d 809, 815–16 (3d Cir.1994). "[O]ne who is without actual authority, but who purports to act according to official power, may also act under color of state law." *Id.* 42 F.3d at 816.

 It is well-settled that "[w]hether a police officer is acting under color of law does not depend on his on-or off-duty status at the time of the alleged violation." *Laughlin v. Olszewski,* 102 F.3d 190, 192 n. 1 (5th Cir. 1996). Indeed, even "off-duty police officers who *purport* to exercise official authority will generally be found to have acted under color of state law." *Barna,* 42 F.3d at 816 (emphasis added). Moreover, an off-duty police officer can act under color of state law by exercising *actual* police authority. *Id.* 42 F.3d at 817 (fact that officer was off-duty "is not dispositive of whether [she] w[as] exercising actual police authority"). "Deciding whether a police officer acted under color of state law should turn largely upon the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties." *Pickrel v. City of Springfield,* 45 F.3d 1115, 1119 (7th Cir. 1995); *accord Martinez v. Colon,* 54 F.3d 980, 986 (1st Cir.), *cert. denied sub nom. Martinez–Rodriguez v. Colon Pizarro,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995) (determination turns on "nature and circumstances of the officer's conduct to the performance of his actual duties"); *Barna,* 42 F.3d at 817 (court looks for evidence that officer was on official police business to determine whether she exercised actual authority). Put another way, the search is for an "actual or purported relationship between the officer's conduct and his duties as a police officer." *Roe v. Humke,* 128 F.3d 1213, 1216 (8th Cir.1997). Thus, police officers working as private security guards often will be found to be acting under color of state law where they identify themselves as police officers, wear their police uniforms, flash their badges, threaten to use power conveyed upon them by their status as police officers in order to make arrests, call in other officers, drive police cars, take actions consistent with municipal or state regulations governing police, etc.. *See Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423 (10th Cir.1984) (subsequent history omitted); *Traver v. Meshriy,* 627 F.2d 934 (9th Cir.1980); *Robinson v. Davis,* 447 F.2d 753 (4th Cir.), *cert. denied,* 405 U.S. 979, 92 S.Ct. 1204, 31 L.Ed.2d 254 (1972); *Watkins v. Oaklawn Jockey Club,* 183 F.2d 440 (8th Cir.1950); *Crowder v. Jackson,* 527 F.Supp. 1004 (W.D.Pa.1981); *cf. Griffin v. Maryland,* 378 U.S. 130, 135, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964) (deputy sheriff employed by private park operator acted under color of state law when he ordered person to leave park, escorted him out and arrested him for criminal trespass) (Fourteenth Amendment state action analysis).

 Here, Raso wore her police uniform. She responded to a call from Mall security

---

7. Section 1983 provides, in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

addressed specifically to off-duty Cherry Hill police officers working at the Mall. She identified herself to Abraham as a police officer by virtue of being dressed in uniform and ordering him repeatedly to get out of the car and to stop the car. She was attempting to apprehend and arrest a person whom she had probable cause to believe had just committed a misdemeanor. She also was trying to prevent a person whom she had been advised was intoxicated from operating a car. Finally, Township of Cherry Hill Ordinance 8–19 provides that members of the Bureau of Police "shall at all times take appropriate police action to protect life and property, preserve the peace, prevent crime, detect and arrest violators of the law, and enforce all Federal, State, Local Laws and Ordinances coming within the jurisdiction of the Bureau of Police." (*See* Brief of Cherry Hill Ctr. et al. in Support of Motion for Summary Judgment, Ex. N).

Under these circumstances, there can be no doubt that Raso acted under color of state law when she shot Abraham. The discussion now turns to whether Raso violated Abraham's constitutional rights.

### 2. *Excessive and Deadly Force Standards*

The Third Circuit Court of Appeals recently explained the nature of a § 1983 excessive force claim:

An excessive force claim under § 1983 arising out of law enforcement conduct is based on the Fourth Amendment's protection from unreasonable seizures of the person. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates the Fourth and Fourteenth Amendments to the United States Constitution. *Brown v. Borough of Chambersburg*, 903 F.2d 274, 277 (3d Cir.1990).

*Groman v. Township of Manalapan*, 47 F.3d 628, 633–34 (3d Cir.1995).

In *Ridgeway v. City of Woolwich Twp. Police Dep't*, 924 F.Supp. 653 (D.N.J.1996), this Court summarized the criteria to be used in measuring whether an officer's use of force is excessive.

Whether an officer's use of force is "excessive" must be measured under an objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight...." *Id.* 490 U.S. at 396, 109 S.Ct. at 1872. A court should consider only those facts and circumstances known to the officer at the time of his or her action. *Rodriguez v. City of Passaic*, 730 F.Supp. 1314, 1322 (D.N.J.), *aff'd* 914 F.2d 244 (3d Cir.1990). The Court must balance the degree of intrusion on a citizen's Fourth Amendment rights against the government's interest in effectuating the detention. *Tennessee v. Garner*, 471 U.S. [1, 7–8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)]. Factors to consider in evaluating an officer's use of force include the severity of the crime at issue, whether the suspect poses an immediate threat to the officer's safety or that of others, and whether the suspect is actively resisting arrest or trying to evade arrest by flight. *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir.1995) (quoting *Graham* 490 U.S. at 396, 109 S.Ct. at 1871). Additionally, the Supreme Court has noted that decisions about deadly force "must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain and rapidly evolving." *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872.

*Id.* 924 F.Supp. at 657; *see also Rodriguez v. City of Passaic*, 730 F.Supp. 1314, 1323 n. 15 (D.N.J.), *aff'd*, 914 F.2d 244 (3d Cir.1990) (table) ("[O]ne must not lose sight of the fact that [the officer] ... [i]s forced to act in the blink of an eye.").

As to deadly force, in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court stated that "where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force

to do so." *Id.* 471 U.S. at 11, 105 S.Ct. 1694. However,

> [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* 471 U.S. at 11–12, 105 S.Ct. 1694. Summary judgment "is appropriate if, as a matter of law, the evidence would not support a reasonable jury finding that the police officer['s] actions were objectively unreasonable." *Groman,* 47 F.3d at 634.

### 3. *Issues of Fact*

■■■ Viewing the evidence in the light most favorable to plaintiff and drawing all justifiable inferences in her favor, and considering the controlling law, this Court finds that the following material facts have been established: (1) Raso was advised that Abraham was intoxicated or under the influence; (2) Abraham evaded apprehension by Mall security guard Roberto Avilez, got into his car and disobeyed Raso's commands that he not get into the car or that he exit the car; (3) Abraham recklessly drove his car in reverse and at a high rate of speed—with Avilez, Redding and Raso all in close proximity to the car—out of his parking space and rammed into another parked car; (4) Raso, in police uniform, positioned herself towards the front of Abraham's car and commanded

him at least half a dozen times to stop the car and to get out of the car, and effectively warned him that she would use her gun to stop him if he kept driving at her; (5) Raso was close to Abraham's car as Abraham inched his car towards her and, at some point, Abraham accelerated his car and drove it towards Raso; (6) Raso believed that Abraham was trying to hit her or was acting with reckless disregard for whether or not he hit her; and (7) Raso jumped to her right out of the car's path and fired her gun once at the driver-side window.[8]

Plaintiff argues that there are three genuine issues of material fact making summary judgment inappropriate. This Court disagrees. Plaintiff argues first that there is a triable issue of fact concerning whether Raso was in front of Abraham's car when Abraham accelerated forward. Plaintiff asserts that witnesses Lisa Brittingham and William Duhart both have placed Raso at the rear driver side of the car *after* Abraham reversed out of his parking space. The evidence squarely contradicts this assertion. Brittingham says she did not see Raso anymore once Abraham backed his car up. (Grand Jury Testimony of Brittingham at 105). Similarly, Duhart, who was in the car with Brittingham, "couldn't tell" where Raso was after Abraham backed out of his spot; at the time when Abraham's car lurched forward and he heard a gunshot, Duhart says, "[t]he officers are on the other side of the car, the car obstructs my vision." (Grand Jury Testimony of William Duhart at 91). Officer Washick says he did not see Raso until he observed her running after Abraham's car. He claims to have had a clear view of the scene at the time of the shooting, but he cannot place Raso anywhere near Abraham's until after the shoot-

---

8. Plaintiff makes much of the fact of Raso's changed story regarding whether she was hit by Abraham's car. She says the jury reasonably could infer from the fact of this changed testimony a consciousness of wrongdoing on Raso's part. This argument is without force. The undisputed fact is that Raso initially said she could not recall whether she was hit by the car or carried by her own momentum, and then later said she definitely could recall that her left leg had gotten caught on the car as she tried to get out of the way. Thus, Raso did not change her account of what happened, but rather changed her account of what she could recall clearly. In

view of this fact, and in light of the entire record in this case, to infer some "consciousness of wrongdoing" on Raso's part would be unjustifiable and unreasonable. But, in any event, Raso's consciousness of wrongdoing is not dispositive here. Plaintiff argues as if there were a *mens rea* to be established in this case. In fact, the relevant test in this case is an objective one: whether Raso's use of force was objectively reasonable in light of the circumstances confronting her, regardless of her motives or intentions. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

ing, whereas Raso and five witnesses all saw Raso close to the car as the events just prior to the shooting unfolded. Washick was traveling on foot from the southeast corner of the Mall towards the scene when the shooting occurred. He says he was still near the Macy's exit and that he "was focused pretty much on the car." (Dep. of David Washick at 27–30). In addition, Washick said in his Grand Jury testimony that he was 150–200 yards away from the scene of the shooting when he heard the lone gunshot. (Grand Jury Testimony of David Washick at 132).

Plaintiff notes that the bullet struck Abraham at the back side of his arm and argues that this wound is consistent with Raso being at the rear of Abraham's car, not the front. The Medical Examiner's report describes the "course of the gunshot wound" as being "from left to right," and, "[i]n the chest," as being *"slightly from front to back* and slightly from above downward." (Camden County Office of the Medical Examiner Postmortem Report, Brief of Abraham in Opp. to Cherry Hill Ctr. et al.'s Motion for Summary Judgment, Ex. 2 at 4) (emphasis added). A front to back bullet trajectory is utterly at odds with a conclusion that Raso was at the rear of the car—that is, behind Abraham—when she fired her gun. Moreover, there simply are no witnesses who place Raso at the rear driver side at the time of the shooting.

"For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3rd Cir.1993). Summary judgment may be granted where the non-movant's evidence is merely colorable or is insignificantly probative. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890–91 (3d Cir.1992). Here, plaintiffs can present no specific or probative evidence that Raso was anywhere other than in front of Abraham's car at the time he accelerated and drove forward. Raso, Avilez, Waters and Saraceni all have stated con-

sistently that Raso was in front of Abraham's car when Abraham accelerated and drove forward. No witness places her anywhere else. No witness has said specifically that he or she had a view of the area in front of Raso's car and that Raso was not in that area. Thus, there are no conflicting accounts of Raso's whereabouts; there are only witnesses—the ones closest to the action—who saw Raso in front of the car and witnesses—two whose vision was obscured and one who was far away across the parking lot—who did not see her *at all* when the shooting occurred. This Court concludes that there is no genuine issue as to whether Raso was in front of Abraham's car as he began to accelerate forward.

Second, plaintiff asserts there is a genuine issue of fact as to whether Abraham accelerated his car towards Raso or merely inched forward before driving off to Raso's side. Plaintiff claims there is a genuine issue because while two witnesses say Abraham was inching his car towards Raso, Waters claims that Abraham accelerated immediately. But Waters does not claim that Abraham accelerated "immediately" and he does not say that Abraham was not inching his car forward before accelerating. In his deposition, Waters first said that Raso was telling Abraham repeatedly "stop the car, stop the car, stop the car," and then said that "[t]he individual accelerated from a high rate of speed from where he struck the first car and aimed his vehicle directly at her." (Dep. of Waters at 66). As for the witnesses who said Abraham was inching towards Raso, one says he heard the sound of a foot stomping on the accelerator and saw the car lunge forward, (Dep. of Saraceni at 66), and the other testified before the Grand Jury that, after inching his car forward, Abraham "slammed the vehicle," "gunned the car," and hit Raso's left side and left leg. (Grand Jury Testimony of Eriberto Aviles at 117–18). In sum, there is no evidence showing the existence of a genuine issue as to whether Abraham accelerated as he drove towards Raso.

Third, plaintiff argues that "a rational jury could easily find that Raso was not hit as defendants claim." She contends there is a genuine issue of fact because Raso initially

told police that she had not been hit—a claim at odds with Aviles's, Waters's and Saraceni's accounts—and then later said she had been hit.

Raso has not changed her story in the stark fashion suggested by plaintiff. She stated at one point that she could not recall whether she had been hit or carried by the momentum of her jump, and later stated that she could recall without a doubt that she had been hit when her left leg got caught on the hood of the car as she tried to jump to safety. Moreover, the evidence—specifically, Waters's, Avilez's' and Saraceni's accounts—points very strongly to a conclusion that Raso's left leg was hit or clipped by Abraham's car. Nonetheless, this Court finds there is a genuine issue as plaintiffs suggest. As discussed below, however, whether Raso actually was hit is immaterial.

Finally, this Court notes the slight discrepancies in the evidence concerning Raso's exact location when Abraham started driving towards her. Most accounts place Raso towards the eastern edge of the parking space abandoned by Abraham's car, while an early statement by Raso places her further east, towards the center of aisle sixty-eight. When examining minor discrepancies in accounts of Raso's location at a precise moment in time, this Court is cognizant, as it must be, that Raso and Abraham were in motion during most of the events, and that the whole incident took place in a matter of seconds. Still, there is an issue as to Raso's precise location at the instant she perceived Abraham accelerating. As discussed below, this Court finds that this issue too is immaterial.

### 4. *Judgment as a Matter of Law*

 In light of the facts clearly established by the record, this Court is convinced that, as a matter of law, a reasonable jury could not find by a preponderance of the evidence that Raso's use of deadly force was objectively unreasonable. *See Groman,* 47 F.3d at 634. Under the controlling legal standards, it was objectively reasonable for Raso to make a split-second determination that Abraham posed a threat of serious physical harm to others and that deadly force was necessary to apprehend him. *Cf. Ridgeway*

*v. City of Woolwich Twp. Police,* 924 F.Supp. 653, 658 (D.N.J.1996) (suspect had demonstrated to officer that he was type of person with dangerous disposition who would cause fatal injury to others and it was objectively reasonable to make split-second determination in heat of moment that deadly force was necessary to stop suspect); *Hinton v. Lee,* Civ. No. 91–1874, 1995 WL 295296, at *4 (E.D.La. May 9, 1995) (where suspect's "conduct indicated that he intended to escape no matter what the cost, and he threateningly drove his vehicle directly at a police officer in a final effort to accomplish his goal," a reasonable officer "could conclude that [suspect] posed a threat of serious physical harm," and "officers were therefore justified in using deadly force").

The crux of the matter is that it appeared to all who had a view of Raso and Abraham's vehicle at the relevant time, that Abraham was an out-of-control individual, driving his car towards Raso in an attempt to resist and evade arrest, in an apparent attempt to hit Raso. Plaintiff simply fails to look past the instant of the shooting to the danger any reasonable person would have believed Abraham posed to individuals in the Mall parking lot. He had demonstrated, at the very least, a reckless disregard for anyone who would try to impede his escape. After driving at and nearly hitting Raso head on, he would have continued to drive his car at an accelerating speed and in a reckless manner in a crowded parking lot. It certainly is worth pondering how different this case would appear had Abraham sped away up aisle sixty-eight and killed or seriously wounded a pedestrian(s) or an occupant(s) of another vehicle.

To be sure, it is possible that Abraham did not intend to hit Raso, and that he only was trying to escape—or to scare Raso—and was seeking to avoid Raso. No one ever will know what Abraham's intentions were. But the issue of his intentions simply is not material. For regardless of what Abraham intended, based on the objective evidence, it was reasonable for Raso to believe that Abraham was out of control and was trying to run her down.

As stated above, it is presumed for summary judgment purposes that Abraham's car did not hit or catch Raso's left leg. But this fact does not render a grant of summary judgment in Raso's favor inappropriate. The uncontradicted evidence is that Abraham drove recklessly with individuals standing very near to his car, resisted and evaded arrest, was believed to be intoxicated, disobeyed Raso's repeated commands that he stop the car and get out of the car, accelerated and drove his car towards Raso, and that Raso jumped out of the car's path. Even believing that Abraham's car did not hit Raso, a reasonable jury could not find that Raso's use of deadly force was an objectively unreasonable attempt to deal with an immediate threat of serious physical harm to the public.

There is a question as to Raso's exact location relative to aisle sixty-eight and the cars parked therein when Abraham accelerated forward. Still, the uncontradicted evidence is that Raso was directly in front of Abraham's car, that it accelerated towards her with no outward indication of any attempts to avoid her, that her avenues of escape were perceived as limited by her and other witnesses, and that she jumped to her right at the last second in an attempt to avoid being hit. Therefore, whether Raso was one or two feet from the parked cars on her right or several feet further to the east of them is immaterial, especially since Raso

was forced to assess her situation in the midst of rapidly evolving events against a backdrop of extreme tension.

In conclusion, the evidence in this case supports only one reasonable conclusion: at the time of the shooting, Raso had probable cause to believe that Abraham had resisted and evaded arrest by violent means, and that he posed an immediate and continuing threat of serious physical harm to members of the public. A finding that Raso's actions were objectively unreasonable would itself be unreasonable on the record before this Court.[9] Raso is entitled to summary judgment on plaintiffs' § 1983 excessive force claim.[10]

B. *Cherry Hill Township's § 1983 Liability*

■ The Second Count of plaintiff's complaint states a claim against the Township of Cherry Hill ("the Township") under 42 U.S.C. § 1983 for failing to supervise and discipline Raso.[11] This claim turns on contentions that Raso was psychologically unfit to perform the duties of a police officer due to panic and anxiety disorders for which she was receiving treatment, and that Raso should have been disciplined for a number of past incidents involving insubordination and citizen complaints. The Township has moved for summary judgment.

Since, as this Court holds above, Raso did not violate Abraham's Fourth and Fourteenth Amendment right to be free from

---

9. Plaintiff draws attention to the Township Police Department's General Order on the use of deadly force. Paragraph 12 of the General Order provides: "Officers should not discharge a firearm at or from a moving vehicle except as the ultimate means of self-defense or defense of another, when the suspect is using deadly force by means other than the vehicle." And while the provision is relevant, it cannot be considered in a vacuum. Raso made a split-second decision in an extremely tense situation to fire from very close range at the driver of a car whom she believed to be very dangerous. Finally, even if plaintiff's expert is correct that Raso breached accepted police practice when she initially moved in front of Abraham's car, the fact remains that in the next moments Abraham threatened Raso and placed her in imminent fear of serious bodily harm. It is these moments upon which the reasonable force analysis must focus. *See Wilson v. Meeks,* 52 F.3d 1547, 1554 (10th Cir.1995) (citing cases which confine excessive force inquiry to whether officer was in danger at time of threat); *Young v.*

*City of Killeen,* 775 F.2d 1349, 1352–53 (5th Cir.1985).

10. As this Court finds that Raso's use of deadly force was objectively reasonable as a matter of law because Abraham posed a threat of serious physical harm to the public and deadly force appeared necessary to stop him, this Court need not address the various defendants' contention that Raso's use of deadly force was, as a matter of law, objectively reasonable as an act of self-defense.

11. Plaintiff's complaint does not make it entirely clear that the basis for Cherry Hill Township's liability is its alleged failure to supervise and discipline, but plaintiff has clarified that an alleged failure to supervise and discipline is the claimed basis for the Township's liability. (*See* Abraham's Brief in Opp. to Township of Cherry Hill's Motion for Summary Judgment at 11).

unreasonable seizures, there can be no § 1983 liability on the part of Cherry Hill Township for such a violation. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam); *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1153 (3d Cir.), *cert. denied,* 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995); *Regalbuto v. City of Philadelphia,* 937 F.Supp. 374, 378 (E.D.Pa.1995), *aff'd,* 91 F.3d 125 (3d Cir.) (table), *cert. denied,* — U.S. —, 117 S.Ct. 435, 136 L.Ed.2d 333 (1996); *see also Hinkle v. City of Clarksburg,* 81 F.3d 416, 420 (4th Cir.1996); *Abbott v. City of Crocker,* 30 F.3d 994, 998 (8th Cir.1994); *Webber v. Mefford,* 43 F.3d 1340, 1344 (10th Cir.1994); *Scott v. Henrich,* 39 F.3d 912, 916 (9th Cir.1994), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995); *Thompson v. Boggs,* 33 F.3d 847, 859 (7th Cir.1994), *cert. denied,* 514 U.S. 1063, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995). Accordingly, the Township is entitled to summary judgment on the Second Count of plaintiff's complaint.[12]

The Third Count of the Complaint states a claim against the Township under § 1983 for the deprivation—without due process—of plaintiff's rights, privileges and immunities under the laws and Constitution of the United States, in particular a protected liberty interest in the fundamental right of parenthood. Plaintiff claims the Township's alleged acts and omissions were the direct and proximate cause of these deprivations. This Court has held that Raso did not violate Abraham's constitutional rights. Plaintiff has stated that she is not pressing an independent Fourteenth Amendment claim against the Township. The Township has moved for summary judgment as to all claims, including the one stated in the Third Count. Plaintiff has not presented any argument in opposition and there are no genuine issues of material fact. This Court will grant the Township's motion for summary judgment as to the § 1983 claim(s) stated in the Third Count.

### C. *Assault and Battery*

The Fourth Count states a claim against the Mall, the Rouse Company of New Jersey, Inc., the Rouse Company (hereinafter, when referred to collectively, "the Mall defendants"), Macy's East, Inc. ("Macy's") and Raso for the intentional tort of assault and battery. The defendants have moved for summary judgment.

 Under New Jersey law,

[a] person may be liable for battery if 'he acts intending to cause a harmful or offensive contact ... or an imminent apprehension of such contact' and a 'harmful' or 'offensive' contact 'directly or indirectly results.' 1 Restatement (Second) of Torts §§ 13, 18 (1965). A person who acts with the same intent may be liable for assault even if no contact actually results if the victim is placed in "imminent apprehension" of a harmful or offensive contact. Id. at § 21.

*Giovine v. Giovine,* 284 N.J.Super. 3, 33, 663 A.2d 109, 125 (App.Div.1995) (Skillman, J., concurring and dissenting); *see also Caldwell v. KFC Corp.,* 958 F.Supp. 962, 970 (D.N.J. 1997).

 "Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force." *Groman,* 47 F.3d at 634

---

12. Although the law in the Third Circuit might be read as permitting a municipality to be held liable under § 1983 in a case like this one for a violation of the Fourteenth Amendment's substantive due process component based on a failure to supervise and discipline—even where no individual officer violates the Constitution—this Court need not consider this issue because plaintiff has stated explicitly in one of her briefs that she is not pressing such an independent Fourteenth Amendment claim against the Township. (*See* Abraham's Brief in Opp. to Township of Cherry Hill's Motion for Summary Judgment at 17). Indeed, a careful review of the Second Count establishes that plaintiff's § 1983 cause of action against the Township is limited to a claim that the Township's failure to supervise, train and discipline its officers proximately caused Raso's use of unconstitutionally excessive force. In sum, plaintiff's sole § 1983 claim is a classic "custom or policy" § 1983 liability claim to the effect that the Township was the moving force behind Raso's constitutional violation. As this claim is plaintiff's sole § 1983 claim against the Township, and as Raso committed no constitutional violation, the Township cannot be liable under § 1983.

(citing *Edwards v. City of Phila.*, 860 F.2d 568, 572 (3d Cir.1988)); *see Tetto v. Adell*, Civ. No. 92–4042, 1994 WL 362141, at *9 (D.N.J. June 30, 1994) (citing *Davis v. Hellwig*, 21 N.J. 412, 122 A.2d 497 (1956)); *Wimberly v. City of Paterson*, 75 N.J.Super. 584, 594, 183 A.2d 691, 696 (App.Div.1962); *Noback v. Town of Montclair*, 33 N.J.Super. 420, 427, 110 A.2d 339, 342 (Law Div.1954); *see also* Restatement (Second) of Torts § 118 (1965). The officer may "use only such force as may be reasonably necessary to effectuate the arrest." *State v. Lore*, 197 N.J.Super. 277, 282, 484 A.2d 1259, 1262 (App.Div.1984) (citing *State v. Mulvihill*, 57 N.J. 151, 270 A.2d 277 (1970)). Where a person resists arrest the officer not only is justified in employing reasonable force, but has a duty to employ such force in order to overcome resistance and make the arrest. *State v. Mulvihill*, 57 N.J. 151, 155, 270 A.2d 277, 279 (1970); *State v. Moriarty*, 133 N.J.Super. 563, 573, 338 A.2d 14, 19 (App.Div.1975). Generally, "[w]here ... an offender offers physical resistance to arrest ..., the officer need not retreat, but on the contrary may become the aggressor and use such force as is necessary to overcome the resistance. If such force unavoidably results in the death of the offender, the homicide is justified." *State v. Williams*, 29 N.J. 27, 39, 148 A.2d 22, 28 (1959). The inquiry is an objective one: was the force used reasonably necessary in view of the totality of the circumstances as they appeared to the officer. *Williams*, 29 N.J. at 39, 148 A.2d at 29.

█ As in the Fourth Amendment excessive force context, special standards apply to the use of deadly force. "A police officer is not ... justified in shooting at every escaping criminal to prevent the escape. At the common law it was only when the escaping criminal had committed a common law felony and there was no other way of taking him that the police officer was justified in shooting at him to prevent his escape." *Davis v. Hellwig*, 21 N.J. 412, 416, 122 A.2d 497, 498–99 (1956); *see* Restatement (Second) of Torts § 131. *Davis* reaffirmed the rule that an officer may shoot at a fleeing felon, whereas an officer who shoots at a fleeing offender merely charged with a misdemeanor, breach of the peace or a disorderly persons violation

will be subject to civil liability. 21 N.J. at 417, 122 A.2d at 499; *see Noback*, 33 N.J.Super. at 427, 110 A.2d at 343. When the New Jersey Supreme Court decided *Davis*, "[t]he distinction between common law felonies and misdemeanors persist[ed] in [New Jersey] as a statutory distinction between high misdemeanors and misdemeanors." *Davis*, 21 N.J. at 418–19, 122 A.2d at 500. Read today, the term "high misdemeanors" refers to offenses designated as first, second or third degree crimes. N.J.S.A. 2C:1–4(d). Thus, the rule emerging from *Davis* and related authorities would seem to be that an officer will not be liable for shooting at a fleeing criminal where the criminal has committed a first, second or third degree crime, if such deadly force is necessary to apprehend him, and if such force is otherwise reasonable. *See Davis*, 21 N.J. at 418–19, 122 A.2d at 500–01 (where proofs would have supported prosecution of fleeing thief for entering without breaking with intent to steal, a high misdemeanor, shooting was not without lawful justification); *see also Rodriguez v. City of Passaic*, 730 F.Supp. 1314, 1327 (D.N.J.), *aff'd*, 914 F.2d 244 (3d Cir.1990) (table) (stating that *Davis* "dispelled any notion that the fleeing felon rule applied only to felonies recognized at common law by linking the rule to the state statutory scheme of misdemeanors and felonies").

█ The evidence in this case establishes that under New Jersey law, Raso's use of deadly force was not excessive and her assault and battery upon Abraham were privileged. In the course of resisting arrest, Abraham drove his car at an accelerating rate of speed towards Raso, causing her to attempt to jump out of the car's path, and—when the evidence is viewed most favorably to plaintiffs—putting her in reasonable apprehension of being struck by the car. Raso had probable cause to believe Abraham was under the influence. Before he drove towards Raso, Abraham had driven recklessly while trying to elude arrest. Abraham thus had demonstrated that he posed an immediate threat of serious physical harm to members of the public. Specifically, by the time Abraham began to pull away from Raso, Raso believed he was trying to run her over

or kill her. Thus, Raso in essence believed, and had probable cause to believe, that Abraham had committed, *inter alia*, (1) second degree aggravated assault in violation of N.J.S.A. 2C:12–1(b)(1);[13] (2) the second degree crime of creating a risk of death or injury to a person while resisting arrest and eluding an officer by means of a motor vehicle in violation of N.J.S.A. 2C:29–2(b); (3) attempted manslaughter in violation of N.J.S.A. 2C:11–4(b)(3) and N.J.S.A. 2C:5–1; and (4) attempted murder in violation of N.J.S.A. 2C:11–4(b)(3) and N.J.S.A. 2C:5–1. Therefore, Raso was privileged to commit

the assault and battery in this case and cannot be held liable in tort.[14] This Court will enter summary judgment in favor of Raso on the assault and battery claim.

■■■■ As against the Mall defendants and Macy's, the assault and battery claim is premised on vicarious liability. "[U]nder vicarious liability principles, an employer may be held vicariously liable for an employee's intentional torts only insofar as those torts fall within the scope of the employee's employment." *Caldwell*, 958 F.Supp. at 970. The parties dispute whether Raso was acting

**13.** A person is guilty of second degree aggravated assault where he attempts to cause serious bodily injury to another under circumstances manifesting extreme indifference to the value of human life; a person is guilty of fourth degree aggravated assault where he commits a simple assault on a law enforcement officer acting in the performance of her duties or exhibiting evidence of her authority. N.J.S.A. 2C:12–1.

**14.** This Court recognizes that N.J.S.A. 2C:3–7 provides in pertinent part that the use of deadly force is justifiable where the officer reasonably believes that the crime for which the arrest is being made was homicide, kidnapping, certain enumerated sex offenses, arson, robbery, burglary of a dwelling, or an attempt to commit one of these crimes, and where the officer believes that there is an imminent threat of deadly force to a third party or that the use of such force is necessary to prevent an escape. It is unclear to this Court, however, that this statutory provision defines the entire universe of situations in which an officer is privileged to use deadly force in the sense that the use of such force will not expose her to civil liability.

N.J.S.A. 2C:3–7 is a criminal provision enunciating an affirmative defense—justification—to criminal liability. It is to be employed as such a defense in criminal prosecutions and is not meant to affect civil remedies. N.J.S.A. 2C:3–1. This Court's research has not uncovered any case applying New Jersey law in which an officer's exposure to tort liability has been controlled by N.J.S.A. 2C:3–7. *But see Rodriguez*, 730 F.Supp. at 1323 n. 16 (stating in civil case that with September, 1979, enactment of New Jersey Criminal Justice Code, the rule in New Jersey became that use of deadly force is justified if actor reasonably believes that crime for which arrest is to be made was one of specific crimes listed in 2C:3–7). Statements concerning 2C:3–7 in New Jersey Supreme Court decisions do not make clear whether that provision is meant to define the universe of situations in which an officer is privileged to commit assault and battery, or just those situations in which the use of deadly force will be an affirmative defense to criminal prosecution. *See Fielder v. Stonack*, 141

N.J. 101, 117, 661 A.2d 231, 238 (1995) (suggesting that 2C:3–7 is criminal law constraint on law enforcement's attempt to protect public in most difficult and dangerous situations); *In re Vey*, 135 N.J. 306, 308, 639 A.2d 718, 719 (1994) (per curiam) (stating that police are authorized to use deadly force in justifiable circumstances and citing 2C:3–7); *State v. State Troopers Fraternal Ass'n*, 134 N.J. 393, 414, 634 A.2d 478, 490 (1993) (same); *In re Carberry*, 114 N.J. 574, 578, 556 A.2d.314, 316 (1989) (same).

Thus, this Court is faced with: (1) a body of New Jersey court decisions discussed in the text above which teaches that an officer is privileged to commit assault and battery as long as the force used is not excessive; (2) a body of New Jersey and federal court decisions which teaches that the excessive force analysis does not hinge on the presence of the specific crimes listed in 2C:3–7; and (3) a New Jersey statute which makes the excessive force analysis in the criminal context hinge on the specific crime the suspect is believed to have committed but which apparently has not controlled the question of an officer's tort liability in any reported case. In view of the authorities, this Court concludes that under New Jersey law a police officer will be shielded from liability for assault and battery where she uses deadly force to apprehend a fleeing criminal whose crimes have demonstrated to the officer that he poses an immediate threat of serious danger to the public, where such force reasonably is deemed necessary to effect an arrest, notwithstanding that the suspect's crime is not one of the crimes specifically listed in N.J.S.A. 2C:3–7. Finally, it is to be noted that even if 2C:3–7 does control the inquiry here, Raso's use of deadly force was justified by law because she reasonably believed that Abraham had tried to run her over with his car. Thus, she essentially believed, and had probable cause to believe, that Abraham had tried to run her over with his car. Thus, she essentially believed, and had probable cause to believe, that Abraham had attempted a homicide, which attempt is listed in 2C:3–7 as one of the crimes necessary to justify the use of deadly force.

in the scope of her Mall employment. But the operative point of law is that Raso, owing to her status as a police officer, was privileged to use deadly force. Whether or not she was acting under the scope of her Mall employment, then, since Raso is not liable in tort, there is no tort for which the Mall defendants can be held vicariously liable. As to Macy's, there is nothing in the record to suggest that it employed Raso at any time. But again, even if she had been acting in the scope of Macy's employment, since Raso committed no tort there can be no vicarious liability. This Court will enter summary judgment in favor of the Mall defendants and Macy's as to the assault and battery claims.

### D. Negligence

The Fifth Count states claims of negligence, gross negligence and negligence *per se* against Raso, the Mall defendants and Macy's. Plaintiff alleges that Raso took negligent actions within the course and scope of her employment by the Mall defendants and Macy's. All of these defendants' acts, plaintiff claims, proximately caused her injuries. The defendants all have moved for summary judgment. This Court is unsure which of Raso's acts forms the basis of plaintiff's negligence claim. Her use of deadly force, it is to be noted, has been found to have been reasonable as a matter of law.

 Whatever other conduct on Raso's part plaintiff might be alleging was negligent was not the proximate cause of Abraham's death and plaintiff's injuries. Thus, if not also for other reasons, plaintiff's Fifth Count negligence claims must fail.

Proximate cause is a concept our law has developed to limit recovery in certain circumstances notwithstanding that a cause in fact may exist between the breach of duty and the damages suffered. The determination of proximate cause is to be based upon a mixed consideration of logic, common sense, justice, policy and precedent. *Caputzal v. Lindsay Co.*, 48 N.J. 69, 77–78, 222 A.2d 513 (1966). Non-liability, in circumstances such as are presented here, involves a question of policy and is a matter of law for the court and not the factfinder. Id. at 75, 222 A.2d 513.

*Canesi v. Wilson,* 295 N.J.Super. 354, 362, 685 A.2d 49, 54 (App.Div.1996); *see People Express Airlines v. Consolidated Rail Corp.,* 100 N.J. 246, 264, 495 A.2d 107, 116 (1985) ("Proximate or legal causation is that combination of 'logic, common sense, justice, policy and precedent' that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery.") (quoting *Caputzal,* 48 N.J. at 78, 222 A.2d at 517). "It is fundamental that there must be some reasonable limitation of liability for the commission of the tort. The wrongdoer is not liable in the eyes of the law for all possible consequences. He is thus responsible in damages only for the natural and probable consequence of his negligent act." *Rickards v. Sun Oil Co.,* 23 N.J.Misc. 89, 93, 41 A.2d 267, 269 (1945).

 It is not consonant with logic, common sense, justice, policy, or any precedent to which this Court has been directed, to find that any act on Raso's part proximately caused Abraham's death and plaintiff's injuries. To do so would be to deem a suspected criminal's decision to resist arrest by driving at police officers "natural," "reasonably foreseeable," and in accord with "common sense." It was not reasonably foreseeable that Raso's initial attempts to apprehend Abraham would induce him to engage in life-threatening and public-endangering criminal conduct. Whatever causal chain Raso had put in effect by approaching Abraham to make a lawful arrest, that chain was severed, as a matter of law, by Abraham's decision to resist arrest by violent and dangerous means. Were it otherwise, police officers always would be subject to liability for attempting to arrest suspects whose reaction to such attempts is to become violent and cause injuries to themselves or others.

In sum, it was Abraham's conduct which was the proximate cause of his death and plaintiff's injuries. It was a natural and reasonably foreseeable result of Abraham's conduct that Raso or some other officer on the scene would use all necessary force to prevent him from escaping and from doing serious harm to police officers, security guards or others in the vicinity. Thus, Abraham's conduct—resisting arrest, driving recklessly,

disobeying police commands, pressing down on his car's accelerator and driving at Raso— was a superseding cause and the legal cause of his death.

Insofar as the instant claim seeks to impose *respondeat superior* liability for Raso's negligence, it must fail along with plaintiff's Fifth Count negligence claim against Raso. This Court will enter summary judgment in favor of Raso, the Mall defendants and Macy's as to the Fifth Count's negligence claims.

### E. *Negligent Hiring*

■ The Sixth Count of the complaint states a claim against the Mall defendants and Macy's for negligent hiring. In plaintiff's view, these defendants failed to exercise due care when they hired Raso to work as a security guard because she was taking medication which affected adversely her ability to perform her work, and because working long hours would cause her fatigue and stress. The foreseeable result was that Raso might use deadly force in inappropriate circumstances. Plaintiff alleges that the negligent hiring proximately caused the harm she has suffered. The defendants have moved for summary judgment.

■ The Supreme Court of New Jersey has recognized the tort of negligent hiring which works in some cases to impose liability on an employer for intentional torts committed by its employee beyond the scope of the employee's employment. The plaintiff must show: (1) that the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons;" and (2) "that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." *Di Cosala v. Kay,* 91 N.J. 159, 173–74, 450 A.2d 508 (1982).

As discussed above, Raso did not commit an intentional tort. Her use of deadly force was objectively reasonable as a matter of law. A factfinder cannot impose liability on the Mall defendants or Macy's for an inten- tional tort which was not committed. In addition, as discussed, the proximate cause of Abraham's death and plaintiff's injuries was not any foreseeable misconduct on Raso's part, but Abraham's criminal conduct. In addition, there is no evidence that the Mall defendants or Macy's breached a duty of care. Secondary employment of the type in which Raso engaged was sanctioned explicitly by the Township of Cherry Hill Police Department. The Police Department set limits on the number of hours of secondary employment officers could work. The Mall defendants contacted the Township of Cherry Hill Police Department to arrange for the Mall's employment of off-duty police officers. In this case, they hired an officer in good standing.

■ Plaintiffs allege that Raso was unfit to perform the police-type work of a security guard and that the Mall defendants and Macy's East would have learned this fact had they conducted an investigation into her background. The better view is that the Mall defendants were entitled to rely upon the Police Department's active employment of Raso and its approval of her secondary work hours insofar as they were hiring Raso to perform the police-type functions at issue in this case (i.e., pursuit and apprehension of criminal suspects and the use of force to effect arrests and to protect members of the public). Therefore, this Court cannot agree that the Mall defendants' duty of care in hiring security guards required them to delve into Raso's personnel records.

This Court will enter summary judgment in favor of the Mall defendants and Macy's as to the Sixth Count's negligent hiring claim.

### F. *Negligent Supervision*

■ The Seventh Count of the complaint states a claim against the Mall defendants and Macy's for negligent supervision. The named defendants have moved for summary judgment. Plaintiff alleges these defendants were negligent in that they failed to ensure: (1) that their employees were trained properly with respect to the use of excessive force; (2) that their employees were emotionally and mentally stable; (3) that their employees were not fatigued or stressed from working

two jobs; and (4) that their employees were not under the influence of medication which impaired their ability to perform their duties in a safe and reasonable fashion. Again, assuming these alleged failures to be causes-in-fact of plaintiff's injuries, this Court finds that Abraham's actions were a superseding cause which severed the chain of proximate causation. As plaintiff is unable as a matter of law to demonstrate proximate causation, this Court will enter summary judgment in favor of the Mall defendants and Macy's as to the negligent supervision claim.

### G. Punitive Damages

The Eighth Count states a claim against all defendants except the Township of Cherry Hill for punitive damages. All named defendants seek summary judgment.

"The purpose of punitive damages is to punish a wrongdoer and deter others. To be subject to liability for punitive damages, a defendant's conduct must be willfully and wantonly reckless or malicious." *Gennari v. Weichert Realtors,* 148 N.J. 582, 610, 691 A.2d 350, 368 (1997). "There must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and wilful disregard of the rights of another." *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 48, 477 A.2d 1224, 1230 (1984). As to willfulness or wantonness, "the requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Berg v. Reaction Motors Div., Thiokol Chem. Corp.,* 37 N.J. 396, 414, 181 A.2d 487, 496 (1962). "However one describes the conduct that will justify punitive damages, one thing is clear: 'The key to the right to punitive damages is the wrongfulness of the intentional act.' " *Fischer v. Johns–Manville Corp.,* 103 N.J. 643, 655, 512 A.2d 466, 472 (1986) (citing *Nappe,* 97 N.J. at 48, 477 A.2d at 1230).

Plaintiff has pointed to no circumstances or evidence supporting a finding of an evil-minded act, willful and wanton maliciousness or recklessness, willful and wanton disregard of plaintiff's rights, or intentional wrongdoing on the part of any defendant. Punitive damages are unwarranted. This Court will enter summary judgment in favor of defendants on the punitive damages claim. The discussion turns now to consideration of Raso's and Joris Hoogendoorn's complaint ("Raso's complaint") and the motions for summary judgment relating thereto.

### H. Macy's Negligence

The Seventh through Tenth Counts of Raso's complaint state negligence claims against Macy's and John Doe(s) (referred to collectively as "Macy's"). Raso alleges that Macy's negligently had inadequate security and allowed known suspected shoplifters to leave the store, thereby placing Raso in imminent danger and causing her and Hoogendoorn's injuries. Macy's has moved for summary judgment. Raso has not filed a notice of opposition or a brief in opposition. This Court will enter summary judgment in favor of Macy's on Raso's negligence claims.[15] The discussion now turns to consideration of the insurance coverage issues in this case.

### I. Uninsured Motorist Insurance Coverage for Raso's Injuries

At the time of the events in this case, Raso was insured by CNA Insurance Co. ("CNA") under a policy which provided uninsured motorist ("UM") and underinsured motorist ("UIM") benefits ("the CNA policy"). Raso advised CNA of her intention to seek UM/UIM benefits, prompting CNA to file a motion to intervene. By Order dated March 7, 1997, the Magistrate Judge granted CNA's motion to intervene. On November 3, 1997, CNA filed an amended intervening complaint, naming Liberty Mutual Insurance Company ("Liberty Mutual") as third-party defendant. Liberty Mutual provided a business automobile insurance policy to the Rouse Company ("the Liberty Mutual poli-

---

**15.** The First through Sixth Counts of Raso's complaint state negligence claims against Abraham's Estate. Vanessa Abraham as Administratrix, and Vanessa Abraham individually ("Abraham defendants"). Neither Raso nor Abraham have moved for summary judgment on these claims. Therefore, they are not ripe for disposition.

cy"). The Liberty Mutual policy has a UM/UIM clause. CNA alleges that if Raso is entitled to a recovery based on UM/UIM coverage, then Liberty Mutual will be liable for some portion of that recovery. CNA's instant motion for summary judgment seeks a determination that Raso is not entitled to UM benefits under the CNA policy. Similarly, Liberty Mutual's instant motion seeks a determination that Raso is not entitled to UM benefits under the Liberty Mutual policy. Raso has filed a cross motion for summary judgment against CNA.

1. *Raso's Coverage under the CNA Policy*

The CNA policy provides, in pertinent part:

We pay damages which you or any covered person are legally entitled to recover from the owner or operator of an uninsured motor vehicle or boat because of bodily injury:

1. Sustained by you or any covered person; and

2. Caused by a motor vehicle or boat accident.

. . . .

The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the uninsured or underinsured motor vehicle or boat.

"Accident" or "Occurrence" means an event or series of related events resulting from continuous or repeated exposure to the same general conditions that unexpectedly, unintentionally, and suddenly causes bodily injury or property damage during the policy period.

 The parties do not dispute that Abraham was uninsured at the time of the relevant events. The dispute concerns whether or not Raso's injuries were caused by a motor vehicle "accident." Specifically, CNA argues that whether an "accident" occurred—that is, whether the events here "unexpectedly" and "unintentionally" caused Raso's injuries—must be determined by looking at Abraham's intent. Raso says the determination must be made by looking at Raso's intent.

The controlling rule emerges from *Lindstrom v. Hanover Insurance, Co.*, 138 N.J. 242, 649 A.2d 1272 (1994), in which the Supreme Court of New Jersey stated:

PIP [personal injury protection] coverage differs from both automobile-liability and uninsured-motorist coverage, neither of which applies to injuries caused by an act that is an accident from the victim's perspective but that is intended by the actor. As the court explained in *Cerullo v. Allstate Insurance Co.*, 236 N.J.Super. 372, 565 A.2d 1125 (App.Div.1989), the differences between PIP and uninsured-motorist coverages are traceable to the significantly different needs that each coverage satisfies.

*Lindstrom*, 138 N.J. at 249, 649 A.2d at 1275.

Lower New Jersey court decisions applying the victim's-perspective standard support Raso's position. *See Sciascia v. American Ins. Co.*, 183 N.J.Super. 352, 443 A.2d 1118 (Law Div.1982), *aff'd*, 189 N.J.Super. 236, 459 A.2d 1198 (App.Div.1983) (per curiam); *accord Continental Ins. Co. v. Miller*, 280 N.J.Super. 85, 654 A.2d 514 (Law Div.1994). However, the standard relied upon in these decisions was rejected explicitly by the Supreme Court in *Lindstrom*, 138 N.J. at 249–50, 649 A.2d at 1275 ("To the extent that *Sciascia* [ ] . . . rests on the notion that for uninsured-motorist-coverage questions courts must determine the issue of whether an accident occurred from the perspective of the covered victim rather than from the uninsured tortfeasor, that case is no longer respectable authority.").

Raso attempts to dismiss the Supreme Court statements—at least the one rejecting *Sciascia*—as "mere dicta." This attempt fails. First, this Court joins two other courts in concluding that the Supreme Court made it clear in *Lindstrom* that the proper focus is on the uninsured actor's intent, and that UM coverage does not apply where the injury-causing event results from the uninsured actor's intentional acts. *See State Farm Mut. Auto. Ins. Co. v. Blystra*, 883 F.Supp. 583, 586 (D.N.M.1995); *Britt v. Phoenix Indem. Ins. Co.*, 120 N.M. 813, 907 P.2d 994, 997 (1995).

Second, assuming the *Lindstrom* statements to be dicta, this Court must consider them because they are considered statements of the Supreme Court. *See Travelers Indem. Co. of Ill. v. Dibartolo*, 131 F.3d 343, 348 (3d Cir.1997); *2–J Corp. v. Tice*, 126 F.3d 539, 541 (3d Cir.1997); *Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 98 F.3d 78, 91 (3d Cir. 1996). The statements demonstrate clearly that in this case the New Jersey Supreme Court would hold that the uninsured actor's perspective controls and that UM coverage does not apply where the injury-causing "accident" results not from negligence, but from the uninsured actor's intentional acts.

▇ Raso next argues—somewhat ironically in light of her position elsewhere in this case—that there is a genuine issue as to whether Abraham actually was trying to hit Raso. Even assuming that Abraham did not intend in the literal sense to hit Raso, however, this Court finds that his intentional tortious act caused her injuries.

The inquiry is whether Abraham intended the act which caused Raso's injuries. *Lindstrom*, 649 A.2d at 1275. Since the ultimate determination to be made is whether the accident resulted from negligence or an intentional act, the intent analysis here appropriately proceeds against the backdrop of tort principles. The evidence viewed most favorably to Raso is that Abraham did not commit a battery—that is, that he did not intend to hit Raso and that he did not hit her. However, the evidence viewed most favorably to Raso also shows that Abraham assaulted Raso.

▇ Abraham committed the intentional tort of assault when he put Raso in imminent apprehension of a harmful or offensive contact. The state of mind requirement for assault is satisfied where an act is done "with knowledge that, to a substantial certainty, [imminent] apprehension will result." Re-

statement (Second) of Torts § 21, Comment d; *see* W. Page Keeton et al. *Prosser and Keeton on Torts* § 8 (5th ed. 1984) (intent "extends ... to those [consequences] which the actor believes are substantially certain to follow from what the actor does"). On the record before this Court there can be no more than a "metaphysical doubt" that Abraham acted with this intent. *Matsushita Elec. Idus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, his assault succeeded: it caused Raso to fear for her life and to act accordingly.

In sum, the evidence viewed most favorably to Raso is that Abraham was not injured by an uninsured motorist as the result of an "accident," but rather was injured as the result of the uninsured motorist's intentional tortious—if not criminal—act. Therefore, as a matter of New Jersey law, Raso is not covered for these injuries by the UM provision of the CNA policy. Raso's motion for summary judgment to the contrary will be denied. This Court will enter summary judgment on behalf of CNA as to Raso's non-coverage under the UM provision of the CNA policy.[16]

2. *Raso's Coverage Under the Liberty Mutual Policy*

The possibility that Liberty Mutual might be exposed to liability by way of CNA's exposure having been foreclosed, Liberty Mutual is entitled to summary judgment. Moreover, as the UM provision of the Liberty Mutual policy is in all material respects identical to CNA's UM provision, this Court finds, for the reasons discussed above in connection with CNA's motion, that Raso is not covered for her injuries under the UM provision of the Liberty Mutual policy. Accordingly, this Court will enter summary judgment on behalf of Liberty Mutual as to Raso's non-coverage under the UM provision of the Liberty Mutual policy.[17]

16. Given this Court's disposition of CNA's motion for summary judgment, it is not necessary to address CNA's contention that Raso is not entitled to recovery for her psychiatric injuries and wage loss as those injuries did not arise out of the ownership, maintenance or use of an uninsured motor vehicle.

17. Liberty Mutual also has moved for summary judgment seeking a determination that Raso is not an "insured" under the Liberty Mutual policy entitled to UM coverage arising from an "accident" for which an uninsured motorist is liable. Because this Court has ruled that Raso's injuries

## V. CONCLUSION

This Court will dismiss all claims addressed by the various defendants' and intervenors' motions for summary judgment. The sole claims remaining in this action are the tort claims against Abraham's Estate, Vanessa Abraham as Administratrix, and Vanessa Abraham individually which are stated in the First through Sixth Counts of Raso's and Hoogendoorn's complaint. This Court will enter an order consistent with this Opinion on an even date herewith.

did not result from an "accident" for purposes of UM coverage under New Jersey law, and is granting summary judgment to Liberty Mutual on that basis, it is not necessary to determine whether Raso is an otherwise covered "insured" under the terms of the Liberty Mutual policy.